# Exhibit A

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN
AND FOR MIAMI-DADE COUNTY,
FLORIDA

RICHARD CARDINALE

     Plaintiff,

CASE NO.:

vs.

DAVID FEINGOLD, MICHAEL
DAZZO, and TODD SANDERS,

     Defendants.

_____/

## COMPLAINT

Plaintiff Richard Cardinale ("Cardinale"), by and through his undersigned counsel, hereby files his Complaint against Defendants David Feingold ("Feingold"), Michael Dazzo ("Dazzo"), and Todd Sanders ("Sanders") (collectively, "Defendants"). In support thereof, Cardinale states:

## INTRODUCTION

1.    This case involves a campaign by Defendants to defame Cardinale and tortiously interfere with his business relationships.

2.    Defendants have intentionally interfered with and defamed Cardinale to investors in private funds that Cardinale manages, the vast majority of whom are individuals that Cardinale has long-standing relationships with and who are former clients, friends, and family.

3.    Defendants' campaign was designed to destroy Cardinale's reputation in the business community and with his investors, and to cause the investors to invest with a competing business of Defendants.

4.      In the end, Defendants' scheme, in part, succeeded: Defendants' defamatory statements harmed Cardinale's business reputation, and certain of the investors, relying on these false and defamatory statements, not only invested with Feingold and Dazzo's competing business, but some also initiated litigation against Cardinale based on Defendants' defamatory statements. Cardinale's relationships with these investors have been substantially impaired, and he is now faced with lawsuits brought by a number of them based on the Defendants' egregious and unlawful conduct.

## PARTIES, JURISDICTION AND VENUE

5.      This is an action for defamation *per se*, defamation, civil conspiracy, and tortious interference in which the amount in controversy exceeds $750,000 in damages, exclusive of interest, costs and attorney fees.

6.      Plaintiff, Richard Cardinale is an individual whose residence is Richmond County, New York.

7.      Defendant, David Feingold is an individual whose residence is Miami-Dade County, Florida.

8.      Defendant, Michael Dazzo is an individual whose residence is Miami-Dade County, Florida.

9.      Defendant, Todd Sanders is an individual whose residence is Miami-Dade County, Florida.

10.      This Court has jurisdiction over Defendants because they are residents of Florida and under Section 48.193(1)(a)(2), Florida Statutes, because they committed a tortious act in the state of Florida.

11.      Venue is proper in the Circuit Court in and for Miami-Dade County, Florida because at least one of the Defendants resides in Miami-Dade County.

## FACTUAL ALLEGATIONS

### A.    The Income Fund and Alternative Global 1-6

15.    Cardinale is a successful New York securities broker who had a sterling reputation in his industry.  Over his 27-plus year career, he successfully raised substantial capital, including in the pre-IPO space with companies such as Facebook, Twitter, Airbnb, Lyft, and Palantir.

16.    In 2019, Cardinale embarked on a new business opportunity, raising capital for investments in alternative businesses, including real estate development, merchant cash advance, and debt settlement (the "Venture").

17.    Cardinale partnered in the Venture with Dazzo, a long-time friend of over thirty (30) years with experience in the debt settlement business, and with Feingold, an attorney with whom Cardinale had previously conducted business and whom Dazzo had initially recommended to Cardinale because of Feingold's relationships in the lot development and homebuilding businesses.

18.    Feingold devised the investment structure for the Venture.

19.    In August 2019, under the structure that Feingold devised, Cardinale formed L3 Capital Income Fund, LLC (the "Income Fund"), for the purpose of raising capital for the Venture. L3 Capital Management, LLC ("L3 Management") is the manager of the Income Fund.  Cardinale is a member and sole Manager of L3 Management through which he receives a 2% acquisition fee for funds that he raises for the Income Fund.  Neither Defendants nor any entities that they own or control have ever been members or managers of the Income Fund.

20.    Cardinale, Feingold, and Dazzo formed a series of six limited liability companies called Alternative Global One, LLC through Alternative Global Six, LLC (collectively, "AG 1-6") to invest monies borrowed from the Income Fund in various alternative business opportunities,

including the real estate development, debt settlement, and merchant cash advance businesses, among others (the "Investment Companies").

21.     Because of Cardinale's successful background and his relationships with investors, he was principally responsible for raising capital for the Income Fund.  In total, Cardinale raised approximately $81 million from approximately 100 Income Fund investors (the "Investors"). Many of the Investors were individuals with whom Cardinale had long-standing relationships, either as clients or investors in Cardinale's previous ventures, as well as friends or family.  Some of these investors are residents of Florida.

22.     Cardinale had a prior business relationship with Defendant Sanders within the securities industry. Sanders participated to a lesser extent than Cardinale in soliciting investors to raise capital for the Income Fund. He was compensated for his services.

23.     The Income Fund agreed to loan monies it had raised from the Investors to AG 1-6 (the "Loan Agreements").  Under the Loan Agreements, the Income Fund loaned AG 1-6 money that those entities then deployed for investment in the various business lines.  Feingold, Dazzo and Cardinale all agreed that after AG 1-6 successfully repaid the loans it had received from the Income Fund, any remaining profits would be transferred to a single entity—Alternative Global Management, LLC ("AGM"), which would then disburse the remaining profits. Cardinale, Feingold, and Dazzo are all members of AGM, along with certain other Investors.

24.     Before they resigned as Members of AG 1-6, Feingold and Dazzo identified, made, and managed all of AG 1-6's investments.  They also provided information that went into quarterly reports that were prepared on the status of these investments (the "Quarterly Reports"), which Quarterly Reports were provided to Cardinale who, in turn, provided them to the Investors.

25.     Cardinale and his family contributed approximately $2.8 Million to the Venture. Feingold and Dazzo contributed exactly $0.

**B.     Dazzo and Feingold Improperly Solicit the Investors, Threaten to "Ruin" Cardinale, and Resign from AG 1-6.**

26.     Cardinale's relationship with Feingold and Dazzo deteriorated precipitously in the fourth quarter of 2021 after Cardinale inquired about the status and financial condition of the Investment Companies, and even before then, unbeknownst to Cardinale.

27.     At or around the fourth quarter of 2021, Feingold and Dazzo had already hatched a plan to leave AG 1-6, retain control of investments belonging to AG 1-6, interfere with and wrongfully solicit the Investors, and ruin Cardinale.

28.     Feingold and Dazzo concealed their plan from Cardinale.

29.     In breach of their fiduciary duties, Feingold and Dazzo began secretly recruiting Investors to establish relationships with BroadStreet, Inc. ("BroadStreet"), a private equity firm purportedly investing in the same projects as AG 1-6.

30.     As part of this recruitment, Feingold and Dazzo told certain of the Investors that Cardinale was "winding down," was preparing to "retire," and was leaving the business, all of which statements were entirely false.

31.     Defendants also claimed that the Income Fund was an affiliate or sister company of BroadStreet, which was also patently false.

32.     On or about December 21, 2021, Feingold prepared and sent to Cardinale a purported valuation of AG 1-6 and demanded that Cardinale offer to buy Defendants out of AG 1-6. Cardinale refused because Feingold and Dazzo, who had been in control of AG 1-6's alternative business investments, deprived Cardinale of visibility into the financial condition of the

businesses, leaving Cardinale with no basis to ascertain the value of Defendants' interests in AG 1-6.

33. After Cardinale refused the demand, Feingold threatened to "ruin" Cardinale.

34. On January 5, 2022, Feingold sent Cardinale a threatening message, which demanded money for "protecti[ng]" Cardinale, and stated, among other things: "You have benefitted immensely from my work and protection of you and you are going to pay me for that." Feingold further stated: ***"I can assure you that I have no interest in ruining you but I can guarantee that I will if it is necessary."*** (Emphasis added). Feingold's message made baseless accusations about past legal troubles that were a complete fabrication. Feingold further threatened Cardinale with frivolous but allegedly ruinous legal action, stating that he knew "his way around a court room really well" and he would "ruin him" if Cardinale did not agree to pay Feingold an undisclosed amount for his alleged "protection." A true and correct copy of the January 5, 2022 communication is attached hereto as **Exhibit 1**.

35. On or about January 28, 2022, without explanation, Feingold and Dazzo resigned as Managers and purportedly withdrew as Members of AG 1-6.

36. Shortly after their purported withdrawal from AG 1-6, Feingold and Dazzo accepted executive-level positions at BroadStreet.

37. Sanders, with whom Feingold and Dazzo had prior business relationships, also became a partner of BroadStreet.

38. Feingold and Dazzo, along with Sanders, then continued to solicit the Investors—whose names Feingold and Dazzo knew only as a result of their relationship with Cardinale—to establish relationships with BroadStreet and invest in the same business opportunities in which AG 1-6 had invested.

**C.      Defendants Orchestrate the Defamation Campaign to "Ruin" Cardinale and Turn the Investors Against Him.**

39.     Defendants, thereafter, increased their efforts to "ruin" Cardinale and interfere with his relationships with the Investors by engaging in a campaign of defamation and tortious interference, including by seeking to coerce the Investors to establish relationships with BroadStreet.

40.     On June 9, 2022, Defendants originated an email from an account called DSI Professional (without disclosing that they were behind it) that Sanders then sent to the Investors in order to instigate the Investors to file a lawsuit against Cardinale.

41.     In January 2023, after AG 1-6 sued Feingold and Dazzo in the 11th Judicial Circuit in and for Miami-Dade County based on their malfeasance, including the failure to account for or properly manage AG 1-6's more than $81 million in investments (the "Florida Action"[1]), instead of responding to the complaint, Feingold and Dazzo filed a motion to compel the matter to AAA arbitration and included in their motion a number of scandalous and false statements about Cardinale that had nothing to do with the merits of the motion.  AG 1-6 opposed the motion because AG 1-6 was not subject to any arbitration agreement.  The Court agreed with AG 1-6's position and denied Feingold and Dazzo's motion.

42.     In flagrant disregard of the Court's Order denying arbitration, and through the guise of a dissolution action of AGM, Feingold and Dazzo initiated an arbitration action in New York with the American Arbitration Association ("AAA") attempting—unsuccessfully—to circumvent the court's finding that AG 1-6 are not subject to arbitration.  The AGM dissolution action before

---

[1]      *Alternative Global One, LLC, et. al. v. Feingold, Dazzo*, Case No. 2023-000688-CA-01, in the 11th Judicial Circuit in and for Miami-Dade County.

the AAA is captioned *In re: Dissolution of Alternative Global Management, LLC*, AAA Case No. 01-23-0002-2987 (the "Arbitration Action").

43.     On May 22, 2023, Feingold and Dazzo filed an Application for Emergency Interim Measures (the "Application") in the Arbitration Action, the purpose of which was to maliciously defame Cardinale and damage his reputation, especially with the Investors.  In the Application, Feingold and Dazzo included wild and outrageously false statements about Cardinale, which Feingold and Dazzo knew were false and without basis when they included them.

44.     True to their word to "ruin" Cardinale, on May 22, 2023, the same day the Application was filed, Daniel Amaniera ("Amaniera"), who worked with the Defendants at BroadStreet and who was not a party to the Arbitration, but acting in concert and in coordination with the Defendants, emailed a selectively highlighted copy of it to certain of the Investors, highlighting the false statements.  Those Investors were not parties to the Arbitration Action.  A true and correct copy of the email with the selectively highlighted Application is attached hereto as **Exhibit 2**.

45.     The false statements made in the highlighted Application defamed Cardinale in his professional capacity.   Among other statements, Defendants made the following false and defamatory statements about Plaintiff:

a.   That "Cardinale has either lost or misappropriated" $25 million from "Alternative Global One's structured finance portfolio" (Ex. 1, at 19);

b.   that "Cardinale has and continues to decimate the value of Alternative Global One, LLC's structured finance portfolio misappropriating and/or losing about $25 million" (*id.* at 2); and

c.   that "Cardinale has improperly charged AGM funds for his own personal use" (*id.*) (collectively, the "May 2023 Defamatory Statements").

46.     The May 2023 Defamatory Statements were received by the Investors, who are third parties.

47.     The May 2023 Defamatory Statements are entirely false and defamatory.  Cardinale has never engaged in any of the conduct alleged therein.

48.     Defendants did not have any evidence to support the May 2023 Defamatory Statements at the time they were made.  Therefore, at the time of making the statements, Defendants knew that the statements were false.  Defendants fabricated these statements as part of their campaign to "ruin" Cardinale with the Investors and in the business community.

49.     Indeed, as to the $25 million Defendants claimed that Cardinale "misappropriated or lost," Feingold and Dazzo pretended that this figure was based on a heavily redacted spreadsheet that allegedly contained data from one of the companies AG 1-6 had invested in, Samson Horus, LLC ("Samson").  Defendants falsely claimed showed that the value of accounts held at Samson had experienced a precipitous decline in value (the "Samson Spreadsheet").

50.     Contrary to Feingold and Dazzo's false assertions, the heavily redacted Samson Spreadsheet that Feingold and Dazzo purported to rely upon did not show a decline in value at all. Feingold who is a self-proclaimed expert in the merchant cash advance space and who, more specifically, is well versed in Samson's records, knew full well what those figures showed, but intentionally concocted a fiction to fuel the lie that Cardinale "misappropriated" or "lost" $25 million.  Simply put, this was an elaborate, malicious and premeditated scheme to defame Cardinale, "ruin" him, and try to create a "run on the bank" by inciting Investors to demand redemptions from the Income Fund and commence litigation against Cardinale.

51.     Defendants persisted in their defamation of Cardinale.

52.     In the Summer of 2023, Cardinale agreed in good faith to mediate various pending actions with Feingold and Dazzo, including the Florida Action.  That mediation ultimately ended in an impasse in August 2023.  Within a day of the conclusion of the mediation, Defendants

conspired in directing Amaniera to contact numerous Investors on the telephone and falsely and improperly represent to them that Cardinale had demanded that he be paid "high seven, maybe even more figures" and as much as "eight figures" to settle the pending lawsuits. In short, Defendants falsely told investors that Cardinale was standing in the way of them being paid on their investments by demanding a large payment for himself (the "August 2023 Defamatory Statements"). Some of the Investors contacted were residents of Florida.

53.     At the same time, Defendants, through BroadStreet, sent solicitations to Investors requesting that they oust Cardinale and turn over management of the Income Fund to BroadStreet. In return, BroadStreet "guarantee[d]" to make the Investors "whole." The "offer" provided no visibility on the financial condition of AG 1-6's investments and did not explain how, when, or whether the Investors would be made whole, or whether BroadStreet intended to fund its so-called guarantee with properties and monies from investments that already ultimately belonged to the Investors, as opposed to any new cash or assets from BroadStreet.

54.     The August 2023 Defamatory Statements were communicated to numerous Investors, many of whom were residents of Florida.

55.     The August 2023 Defamatory Statements communicated to the Investors are entirely false and defamatory.

56.     Defendants did not have any evidence to support the August 2023 Defamatory Statements at the time they were made. Therefore, at the time of making the statements, Defendants knew the statements were false. They fabricated these statements as part of their campaign to "ruin" Cardinale with the Investors and among Cardinale's business community.

57.     Defendants' primary purpose in making the statements was to induce ill will, hostility, and an intent to harm Cardinale by destroying his reputation among the Investors and in his professional community.

58.     The May 2023 Defamatory Statements and the August 2023 Defamatory Statements (collectively, the "Defamatory Statements") constitute defamation *per se* because they are false accusations of dishonesty, lack of integrity, and untrustworthiness which directly impugn Cardinale's professional reputation by falsely claiming that he engaged in behavior incompatible with the proper ethical or professional conduct of his business trade and that he engaged in criminal activity.

59.     Defendants published the Defamatory Statements for the purpose of destroying the reputation of Cardinale with the Investors and "ruining" Cardinale and his business reputation and ultimately persuade the Investors to sue Cardinale for fraud and to establish relationships with BroadStreet.

60.     Indeed, shortly after Defendants made the Defamatory Statements to the Investors, some Investors sued Cardinale for fraud in the Supreme Court of the State of New York, County of New York in the case styled *William J. Maroney as Trustee of the WJM Trust, et al. v. Richard Cardinale, et al.*, Index No. 653999/2023.

61.     Thereafter, another twelve Investors initiated a proceeding against Cardinale before the American Arbitration Association in the case styled *Anthony Siriani, et al. v. L3 Capital Income Fund, LLC, et al.*

62.     After that, another Investor initiated a lawsuit against Cardinale in the United States District Court for the Southern District of New York in the case styled *KH Capital, LLC v. Cardinale, et. al.*, Case No. 1:23-CV-10099. In that action, the Investor plaintiff alleged that "upon

information and belief, $25,000,000 of the L3 Fund is either missing or had been lost due to Cardinale's poor management; or worse, Cardinale has likely misappropriated the $25,000,000," which were the precise false statements Defendants had previously fabricated and communicated in the May 2023 Defamatory Statements.

63.     A number of the Investors would have invested additional money into the Income Fund but for Defendants' conduct.

64.     Defendants' defamation campaign designed to "ruin" Cardinale has, through Defendants' false representations, irreparably destroyed Cardinale's decades-long relationships with many of the Investors and damaged his reputation in the business community.

65.     As a result of Defendants' conduct, Cardinale has suffered damages, including, but not limited to, economic damages, including the loss of his business relationships, lost business revenue, the costs associated with the lawsuits filed by the Investors, pain and suffering and mental anguish, and damage to his good name and reputation, for which he seeks legal redress.

66.     All conditions precedent to the maintenance of this action have occurred, been performed, complied with, or waived.

67.     Cardinale retained the law firm of Greenberg Traurig, P.A. to represent him in this action and is obligated to pay the firm a reasonable fee for its services.

## COUNT I – DEFAMATION *PER SE*
### (AGAINST ALL DEFENDANTS)

68.     Cardinale realleges and incorporates all allegations in Paragraphs 1-67 as if fully set forth herein.

69.     Defendants published the May 2023 Defamatory Statements and the August 2023 Defamatory Statements to the Investors, who are third parties.

70.     Each of the Defamatory Statements was completely false.

71.     Defendants knew the Defamatory Statements were completely false at the time they were made.

72.     Defendants published each of the Defamatory Statements with malice.

73.     Each of the Defamatory Statements constitutes defamation *per se* because they are statements that Cardinale engaged in behavior incompatible with the proper ethical or professional conduct of his business trade and that he engaged in criminal activity.

74.     Because of the Defamatory Statements, Cardinale has been damaged in an amount to be determined at trial, including without limitation, monetary damages, expenses incurred in connection with investigating and counteracting the defamation, reputational harm, pain and suffering, mental anguish, and personal humiliation.

**WHEREFORE**, Plaintiff, Richard Cardinale, respectfully requests that the Court grant the following relief:

a.     Judgement against Defendants for all damages, including but not limited to, damages for reputational harm, humiliation, suffering, and mental anguish, lost business and revenue, and costs for repairing Cardinale's reputation;

b.     an award of pre-judgment interest, costs and expenses incurred in connection with this action;

c.     such other and further relief as the Court deems just and proper; and

d.     Cardinale reserves the right to seek punitive damages.

<u>**COUNT II: DEFAMATION**</u>
**(AGAINST ALL DEFENDANTS)**

75.     Cardinale realleges and incorporates all allegations in Paragraphs 1-67 as if fully set forth herein.

76.     Defendants published the May 2023 Defamatory Statements and the August 2023 Defamatory Statements to the Investors, who are third parties.

77.     Each of the Defamatory Statements was completely false.

78.     Defendants knew the Defamatory Statements were completely false at the time they were made.

79.     Defendants published each of the Defamatory Statements with malice.

80.     Because of the Defamatory Statements, Cardinale has been damaged in an amount to be determined at trial, including without limitation, monetary damages, expenses incurred in connection with investigating and counteracting the defamation, reputational harm, pain and suffering, mental anguish, and personal humiliation.

**WHEREFORE**, Plaintiff, Richard Cardinale, respectfully requests that the Court grant the following relief:

a.     Judgement against Defendants for all damages, including but not limited to, damages for reputational harm, humiliation, suffering, and mental anguish, lost business and revenue, and costs for repairing Cardinale's reputation;

b.     an award of pre-judgment interest, costs and expenses incurred in connection with this action;

c.     such other and further relief as the Court deems just and proper; and

d.     Cardinale reserves the right to seek punitive damages.

### <u>COUNT III: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS</u><br>(AGAINST ALL DEFENDANTS)

81.     Cardinale realleges and incorporates all allegations in Paragraphs 1-67 as if fully set forth herein.

82.     Cardinale had a business relationship with the Investors, including through the Income Fund.

83.     Defendants knew of Cardinale's relationship with the Investors and intentionally interfered with those relationships.

84.     Defendants acted solely out of malice in order to "ruin" Cardinale and used improper means in interfering with those Investor relationships, including by publishing the May 2023 Defamatory Statements and the August 2023 Defamatory Statements to the Investors, by soliciting the Investors in breach of Feingold and Dazzo's fiduciary duties before they resigned, by falsely telling the investors that Cardinale was "winding down," preparing to "retire," and that BroadStreet was an affiliated entity to the Income Fund.

85.     Defendants' interference caused injury to Cardinale's relationships with the Investors.  Many of the Investors not only established relationships with Feingold and Dazzo's competing business, but some commenced litigation against Cardinale based on Feingold and Dazzo's improper interference.  Cardinale's relationships with many of the Investors have been irreparably harmed.

86.     A number of the Investors would have invested additional money into the Income Fund but for Defendants' conduct.

87.     Because of the interference, Cardinale has been damaged in an amount to be determined at trial, including without limitation, monetary damages, lost business revenue, expenses incurred in connection with investigating and counteracting the defamation, and costs associated with the Investor lawsuits.

**WHEREFORE**, Plaintiff, Richard Cardinale, demands judgment against Defendants for damages, court costs, and interest, together with such further relief as the Court deems just and proper.

<u>COUNT IV: CIVIL CONSPIRACY TO DEFAME AND</u>
<u>TORTIOUSLY INTERFERE WITH BUSINESS RELATIONS</u>
<u>(AGAINST ALL DEFENDANTS)</u>

88.    Cardinale realleges and incorporates all allegations in Paragraphs 1-67 as if fully set forth herein.

89.    Defendants agreed with each other and acted in concert with one another to knowingly destroy Cardinale's reputation by publishing the Defamatory Statements and ruining Cardinale's reputation and his business.

90.    In furtherance of the conspiracy, the Defendants committed overt acts, including publishing the Defamatory Statements and using improper means to interfere with Cardinale's relationship with the Investors.

91.    Defendants' overt acts in defaming Cardinale were unlawful.

92.    Defendants' actions have injured and proximately caused damages to Cardinale in an amount to be proven at trial, including without limitation, monetary damages, expenses incurred in connection with investigating and counteracting the defamation, reputational harm, pain and suffering, mental anguish, and personal humiliation.

**WHEREFORE**, Plaintiff, Richard Cardinale, respectfully requests that the Court grant the following relief:

a.    Judgment against Defendants for all damages, including but not limited to, economic damages, lost business and revenue, damages for the costs associated

with the Investor lawsuits, damages for humiliation, suffering, and mental anguish, reputational harm, and costs for repairing Cardinale's reputation;

b.    an award of pre-judgment interest, costs and expenses incurred in connection with this action;

c.    such other and further relief as the Court deems just and proper; and

d.    Cardinale reserves the right to seek punitive damages.

### **DEMAND FOR TRIAL BY JURY**

93.    Plaintiff, Cardinale demands a trial by jury in all issues so triable.

Dated: January 12, 2024.          Respectfully submitted,

**GREENBERG TRAURIG, PA**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0570
Facsimile: (305) 961-5702

*/s/ A. Sheila Oretsky*
A. SHEILA ORETSKY
Florida Bar No. 0031365
sheila.oretsky@gtlaw.com
THOMAS R. HEISLER
Florida Bar No. 1029852
Thomas.Heisler@gtlaw.com
SANDRA RAMIREZ LOE
Florida Bar No. 1010385
Sandra.Loe@gtlaw.com
FLService@gtlaw.com

AVI BENAYOUN
Florida Bar No. 0151696
BenayounA@gtlaw.com
401 East Las Olas Boulevard
Suite 2000
Fort Lauderdale, FL 33301
Telephone: (954) 765-0500
Facsimile: (954) 765-1477

*Counsel for Richard Cardinale*

# EXHIBIT 1

--- Wednesday ---

2:17 AM

Rich, I strongly urge you to read this message carefully as it will be the last communication that I will ever have with you.  Do not call me, text me, email me or message me because there will be no response.  From this point forward you are not permitted in any manner to mention my name, reference me or in any manner comment upon me other than to say "We have no personal or professional relationship anymore" and any words outside of that simple comment will be met with swift and aggressive legal action.  I can assure you that my only comment to anyone who asks will likewise be the statement that we have no personal or professional relationship anymore. I am serious and I mean it.  Anyone and I mean anyone who receives any form of comment from you outside of the aforementioned will certainly get back to me and then I will certainly take action which will unravel you (remember, I am aware of all of your illusions - graphoid, leesburg, efraim, claims of extensive real estate development experience, games with the operation of your debt settlement, the list goes on and on and really isn't necessary, you get the idea.  Quite simply, I am tired of all of the lies, rumors, backstabbing, etc. . . The only drama I have had in my life in the last many many years has involved somehow either directly or indirectly around things involving you and I simply don't want that and don't want to see you, hear from you or in any way have anything to do with you. You have benefited immensely from my work and protection of you and you are going to pay me for that.  You can figure out what is reasonable

for that. You can figure out what is reasonable and communicate through Mike and that is why he is copied on this. Any attempt to try to change history or spin the truth won't end well for you, so simply come up with something reasonable and we all go off into the sunset. I can assure you that I have no interest in ruining you but I can guarantee you that I will if it is necessary. So be adult, move on, come up with a reasonable separation and then we will never see or speak again. I can assure you that the very very large number of people that are constantly calling me and complaining to me about you will simply be told that I have no personal or professional relationship with you and I will not engage to listen to their long list of complaints about you as I have had to listen to those in the past. Life is too short and since I have nothing to do with you anymore, I simply don't want to hear about it. Be smart and come up with something fair and I can't stress enough again, take this one warning and don't you dare comment about me to anyone beyond what I have authorized you to say in this message. Be smart and put a civil end to this, I promise you, otherwise you won't like my aggressive side. I know my way around a court room really well and the mountains of evidence involving you aren't pretty. You have benefited greatly from my work, put the emotion you may now be feeling aside from my decision to separate from you and do the right thing. Good luck with your life. I will wait to hear from Mike as to your proposal.

# EXHIBIT 2

**From:** Daniel amaniera <danielamaniera@gmail.com>
**Subject: Emergency Filing**
**Date:** May 22, 2023 █████████
**To:** █████████████████
**Attachments:**        Highlighted.Cardinale.Rule 38 Motion and Ex 1.pdf

see attached

# AMERICAN ARBITRATION ASSOCIATION

-------------------------------------------------------------------X

In re:  Dissolution of                                 AAA Case # _____

**ALTERNATIVE GLOBAL MANAGEMENT, LLC,**      **RULE 38 -**
**a limited liability company.**                      <u>**EMERGENCY MOTION**</u>
-------------------------------------------------------------------X

### <u>PETITIONERS' APPLICATION FOR EMERGENCY INTERIM MEASURES</u>

Petitioners David Feingold ("Feingold") and Michael Dazzo ("Dazzo") (collectively, "Petitioners"), hereby respectfully submit this application for an interim award of emergency interim measures pursuant to Rules 38 and 39 of the American Arbitration Association's Commercial Arbitration Rules.

### <u>SUMMARY</u>

Petitioners have filed concurrently herewith their Verified Petition to dissolve Alternative Global Management, LLC, a Delaware liability company ("AGM" or "LLC"), and for a declaration that, based on good cause shown, Petitioners may wind up the affairs of the LLC. Further, Petitioners request an **emergency interim award**, preliminary injunction and permanent injunction against Respondent Richard Cardinale ("Cardinale") restraining him from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies (described below) without the prior written approval and authorization from Petitioners.  A true copy of the Verified Petition with Exhibits A-S is annexed hereto as **<u>Exhibit 1</u>**.

The jurisdiction over Petitioners, AGM and Cardinale and this dispute is provided by the broad and exclusive arbitration provision set forth at Section 10.07 of the Amended and Restated Operating Agreement for AGM (the "AROA") (at **<u>Exhibit A</u>** of Verified Petition).

R-38 of the AAA Commercial Arbitration Rules provides, in pertinent part, that the "arbitrator may take whatever interim measures he or she deems necessary," and that such "interim measures may take the form of an interim award." Such interim award should be made and issued here.

Feingold, Dazzo and Cardinale are the individual managers and control members of AGM. As described in the Verified Petition, Feingold and Dazzo on the one hand and Cardinale on the other hand have irreconcilable differences, do not speak to each other, and are embroiled in litigations against each other. **Meanwhile, Cardinale has improperly seized control over AGM, its business and its assets.**

Cardinale has and continues to engage in fraud and conversion of assets and funds and has blocked Feingold and Dazzo from AGM. Cardinale has and continues to irreversibly decimate the business and assets of AGM. Cardinale has and continues to improperly take unilateral, unauthorized action on behalf of the Alternative Global Companies (described below) without the prior approval and authorization from Petitioners, including:

* **Cardinale has blocked Feingold and Dazzo from AGM and AGM's business and assets.**

* **Cardinale has misappropriated funds from the AGM bank account and has also blocked Feingold and Dazzo from accessing these accounts.**

* **Cardinale has taken control of and continues to decimate an AGM portfolio known as Alternative Spin with millions of dollars in misappropriations and losses.**

* **Cardinale is believed to have siphoned off at least $300,000 from Alternative Spin for his own benefit.**

* **Cardinale has and continues to decimate the value of Alternative Global One, LLC's structured finance portfolio misappropriating and/or losing about $25 million.**

2

    \*    **Cardinale has launched and continues to prosecute multiple litigations by the Alternative Numbered Entities without the consent or approval of Feingold and Dazzo while it also remains unclear who is paying for all these litigations.**

    \*    **Cardinale has brazenly not filed tax returns for AGM.**

    \*    **Cardinale seemingly continues to support a lavish lifestyle (a Staten Island mansion, a New Jersey farm and a beach home next to Giardina's beach home along with expensive cars, jewelry, restaurants and home furnishings) while improperly charging AGM funds or assets for his own personal use and it is believed that he is continuing to do so even while he has also stated that his L3 Capital investors are being required to finance what he considers L3 litigation.**

There is an immediate need to stop Cardinale from continuing to take such unilateral, unauthorized actions that have and continue to cause irreparable damage and injury to the LLC. As such, Petitioners seek this emergency interim award restraining Cardinale from taking any such actions.

## FACTUAL BACKGROUND

We are dealing here with three individuals, Feingold, Dazzo and Cardinale.

Beginning in 2019 and thereafter, they set up six entities, Alternative Global One, LLC, Alternative Global Two, LLC, Alternative Global Three, LLC, Alternative Global Four, LLC, Alternative Global Five, LLC and Alternative Global Six, LLC (collectively, as the "Alternative Numbered Entities" and with AGM the "Alternative Global Companies"), through which they conducted various business, but the Alternative Numbered Entities took nothing, acted as a conduit and the monies flowed up to a seventh entity, AGM, which 100% owns and ultimately manages the Alternative Numbered Entities (as demonstrated in AGM's redated tax returns, **Exhibit B** of Verified Petition).

**AGM, Alternative Numbered Entities and the AROA**

AGM was the initial entity formed by Feingold, Dazzo and Cardinale in connection with the Alternative's business, and the initial AGM Operating Agreement, signed by Feingold, Dazzo and Cardinale is annexed to the Verified Petition as **Exhibit C**.

AGM was formed in order to manage the Alternative Numbered Entities and collect from them the proceeds of their business endeavors and then those proceeds would be first used to pay back amounts owed to Cardinale's L3 Capital Income Fund, LLC ("L3 Capital") investors with amounts above and beyond to be split equally between Feingold, Dazzo and Cardinale. Thus, AGM is essential to the proper functioning of the entirety of the Alternatives' business.

Further, the Alternative Numbered Entities take nothing as part of this process as those entities are merely a conduit for distribution to AGM, as they are simply entities that reflect the source of various monies, *i.e.*, specialty finance, real estate, debt settlement, homebuilding, and restaurants, in order to keep track of sources of divisions but thereafter all monies and management flow up to AGM. Simply put, the Alternative Numbered Entities do not exist without AGM, Feingold, Dazzo and Cardinale.

In or about February 2021, Cardinale himself determined to engage in a restructuring of AGM to allow for certain of his investors to own Class B Units in AGM (non-voting), which resulted in the AROA. Cardinale sent dozens of emails to the Class B investors announcing the AROA and announcing the binding terms of the AROA to the entire AGM business.

The AROA, along with a confirming letter that Cardinale sent to each of his investors advising them of the operation of the business under said document, provides that the management and control of the business and affairs of AGM is vested in the Manager. *See* definition of Manager at p. 3, § 6.01. **Exhibit A** of Verified Petition. This management and control of the business and

4

affairs of AGM includes the business and affairs of AGM's only asset - - the Alternative Numbered Entities - - and the term "Affiliates" (which includes the Alternative Numbered Entities) is repeatedly used throughout the document (*See* definition of Permitted Transferee, 6.01(b), 6.01(c), 6.01(e), 6.10, 6.11(b), 6.12(a), 6.12(b), 6.12(c). 10.07(c)(i), 10.08, 10.16, 10.19, ).[1]

The initial manager of AGM is listed as RMD Holdings, LLC [standing for **R**ichard (Cardinale), **M**ichael (Dazzo) and **D**avid (Feingold)](at page 3) and Dazzo as the Manager of RMD (at signature page), but Cardinale has secreted certain RMD related materials (and others).

The AROA requires the unanimous consent of the managers (if multiple managers are appointed) or the unanimous consent of Feingold, Dazzo and Cardinale to take any action. *See* Cardinale letter ("Class A Units will be the only class of interests in the Company that will have voting rights"), and §§ 6.02, 6.05, 9.01. Cardinale, Feingold and Dazzo agreed to be bound by this subsequent LLC agreement for AGM  -  the AROA - and each of Feingold, Dazzo and Cardinale individually signed member consents for this action pursuant to the initial AGM Operating Agreement between and among them.

Cardinale originally claimed in Federal Court in Florida that his computers were stolen and dubiously that the books and records involving the AGM were missing. Cardinale now miraculously claims that he has certain documents, even though his alleged books and records were supposedly stolen, but miraculously, only the documents which in any way support Feingold and Dazzo have been stolen and yet any document that might arguably help Cardinale, he is able to miraculously produce those documents even though all of his computers and records were

---

[1] "Affiliate" is defined at page 1 and means: "with respect to any specified Person or entity, any Person or entity that directly or indirectly controls, is controlled by, or is under common control with such specified Person or entity and, with respect to a specified Person that is an individual, such Person's Immediate Family Members. For purposes of this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise."

miraculously stolen. This miraculous theft corresponds with a Federal District Judge taking the unusual step of having Cardinale and his wife appear for deposition before any other parties in the Initial Florida Federal Case (discussed below).

While Cardinale will likely object in this case and change his story once again about how he now continues to find documents, what is completely uncontradicted by all parties is that this AGM relationship is broken beyond repair and that the operation of AGM simply cannot continue as the owners of the same simply cannot continue, especially in light of the fact that one owner, Cardinale, continues to file lawsuits without the express consent of the other two owners, Feingold and Dazzo.

Cardinale has unilaterally taken multiple improper actions, including freezing out Feingold and Dazzo, converting and destroying assets, and the filing of unauthorized lawsuits, without Feingold's and Dazzo's approval or consent. Significantly, in the multiplicity of litigations (described below), Cardinale has scrupulously avoided AGM because he is well aware that it is the 100% owner and ultimate manager of the Alternative Numbered Entities and that his improper unilateral acts and conduct, without Feingold's and Dazzo's approval, violate the AROA.

Cardinale's purported amnesia about AGM is startling. In fact, Cardinale's L3 entity *invoiced AGM* for over $1.3 million and was paid *by AGM* over $1.3 million for administrative services he claimed he had provided (but did not) for the Alternative Global Companies (*see* Exhibit D below, Second Amended Complaint, and Exhibit B thereto for those invoices) and Cardinale further received, among other things, a one-third profit split, amounting to approximately $3.3 million, *from AGM*.[2] This profit split occurred at the AGM level, the

---

[2] Cardinale recently testified about this structure in the Initial Florida Federal Case that:

Were there monthly invoices that were sent to Alternative Global Management, LLC? A. Yes.

Alternative Numbered Entities *keep nothing*, and is for the amounts above and beyond those owing to the L3 Capital investors.

Cardinale has already testified and admitted in a court ordered deposition of him that he was paid the $1.6 million (that is the number he admits to), yet he claims ignorance and stolen books and records even though there are no police reports, insurance claims, no written complaints or evidence of those alleged thefts.  Only after Feingold and Dazzo sued Cardinale did Cardinale first claim his books and records were stolen (those same books and records that could be used against him to prove his multi-million dollar scam).

Cardinale now conveniently forgets about AGM and the process that was followed, and that he was paid L3 acquisition fees of $1,598,601.81; L3 advisory fees of $620,000; Alternative Global Management, LLC payments to DZ Squared (between December 1, 2020 and January 1, 2021) of which Cardinale received $2,987,000; Alternative Global Management, LLC management fee payments to RVCSI, LLC (an entity controlled by Cardinale) (between July 24, 2020 and April 8, 2022) of $3,263,055.05; debt settlement payments to Cardinale (between October 19, 2020 and January 28, 2022) of $1,935,000; $410,000 on closing fees paid to L3 Capital Management, LLC; and the in excess of $1.3 million (that Cardinale testified is $1.6 million) paid to Cardinale for claiming to maintain the books and records of the Alternative Global Companies.

---

Q. **So you've received nothing personally or to an entity that you own or controlled from Alternative Global Management, LLC** MR. BENAYOUN: Object to the form of the question. A. **I'm saying I have.** Several times. BY MR. WELTZ:  Q. I thought you said you received those from L3.  I'm going to ask this a different way. How about this, what is the total compensation that you received directly or indirectly as an advisory fee, a management fee, an acquisition fee, and a total compensation? MR. BENAYOUN: Object to the form of the question. A. Okay. So I received over time a 1.6 million acquisition fee, L3 Capital Management received roughly 1.5 million, give or take in fees, administrative fees of which 700,000 was Titan Communications invoicing L3 Capital Management and the balance went to administrative costs. Any other disbursements that were made to David Feingold, Michael Dazzo and Richard Cardinale totaling about 8 -- 6.8 million, 6.9 million. **And those were disbursements which were above the 12 and 15 percent returns that -- with the targeted returns to the investors in the fund.** (emphasis supplied).

All of these payments to Cardinale are set forth above to show that someone that received nearly $11 million in total compensation and $1.6 million in specific payments for keeping the same books and records that he claims are now missing which would prove his fraud, should at a minimum show this Arbitration Panel that the suspicious nature of his handling of critical documents in combination with the obvious acrimonious nature of relationship amongst the owners shows that AGM cannot proceed, is irrevocably broken and should be dissolved quickly.

**Feingold and Dazzo Resign From the Alternative Numbered Entities**

On January 28, 2022, Feingold and Dazzo resigned from the Alternative Numbered Entities, but not AGM, due to Cardinale's fraud and misconduct in connection with the Alternative Global Companies. Feingold and Dazzo stayed in AGM knowing it is the ultimate owner and control party because its value is enormous, millions of dollars were made from the business and by resigning Feingold and Dazzo were immediately entitled to the payment of the fair value of their interests in the business as codified under Delaware law. Hence, they removed themselves from involvement with Cardinale but did not remove themselves from the right to receive Delaware law mandated payments from him.

Feingold and Dazzo could simply no longer maintain a relationship with Cardinale due to dozens of complaints of fraud and dishonesty by investors against Cardinale and their desire to disassociate from him and they also learned of his organized crime ties, including conduct such as being involved in sending thugs to a competitor's home residence to threaten and beat that person. Feingold and Dazzo simply could not be involved with a person whose method of business involved such tactics.

**The Initial Florida Federal Case**

On February 5, 2022, Feingold and Dazzo sued Cardinale and others in the pending action styled *David Feingold and Michael Dazzo v. Richard Cardinale, Vania Cardinale, RVCNY, LLC and RVCSI, LLC*, U.S.D.C. Southern District of Florida, Case No. 1:22-cv-20375-RKS/LMR (referred to herein as the "Initial Florida Federal Case"), wherein the plaintiffs there (Feingold and Dazzo) assert claims against Cardinale (and others) for various misconduct including claims for breach of fiduciary duty, conversion and fraudulent misrepresentation in connection with the Alternative Global Companies. A copy of the operative complaint, the Second Amended Complaint, is annexed to the Verified Petition as **Exhibit D**.

The Second Amended Complaint in that Initial Florida Federal Case includes allegations and evidence that Cardinale, and his long-time business associate, Robert L. Giardina ("Giardina"), recently engaged in gangster-like tactics to try to force a competitor to give over his business to them.[3] (Exhibit D, at ¶¶ 55-62).

Feingold and Dazzo also allege that Cardinale was paid over $1.3 million to maintain books and records that he did not maintain (Cardinale verbally admits it to be $1.6 million), paid

---

[3] Cardinale, Giardina, and another person have owned a merchant cash advance company that, with Giardina, is the subject of a recent Federal Trade Commission settlement (see FTC press release annexed to Verified Petition as **Exhibit E**) and continuing action brought by the New York Attorney General (NYAG Complaint annexed to Verified Petition as **Exhibit F**). Giardina has also invoked the Fifth Amendment in response to questions concerning his own and Cardinale's involvement with that business. *See* portions of Giardina's deposition and court decision annexed to Verified Petition as **Exhibit G**. Giardina was also recently found liable under a civil RICO statute in connection with that business in a case in the United States District Court for the Southern District of New York, where the court there recounted the FTC allegations that included "threatening physical violence when the merchants advise that they cannot make the payments required by the Agreements." ("After Richmond obtained a confessed judgment against the rabbi and synagogue, its harassment grew more intense with threats of a sexual and physical nature to the point where the Rabbi was forced to apply for an order of protection, which the Rabbi received.")("Richmond responded: "We will take everything from you. . . . We are from New York. . . . Don't mess with us."). *See Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, 2022 US Dist. LEXIS 100837, at *16-18 (SDNY June 6, 2022). The similarity between these recent improper tactics and the ones used by Cardinale/Giardina's merchant cash advance company cannot be overstated. It has now further come to light that Giardina has been a secret owner of Cardinale's RIA, L3 Capital Advisors, LLC.

9

additional fees for non-existent advisory services, converted bank account funds and assets and failed to properly disclose the in excess of $10.8 million that Cardinale took from the investors in L3 Capital, an investment fund solely managed by Cardinale. Also, Feingold and Dazzo seek additional substantial damages against Cardinale and his alter-ego entities for the fair value of their membership interests in the Alternative Numbered Entities as mandated by Delaware law.

In the Initial Florida Federal Case, Feingold and Dazzo made a motion to require that Cardinale and the other defendants be deposed prior to their obtaining other discovery based upon concerns that Cardinale would fabricate testimony and the court granted that sequencing motion, finding (**Exhibit H** to Verified Petition, at 3-4):

> Plaintiffs [Feingold and Dazzo] sufficiently allege the presence of unique circumstances that generate a concern that Defendants [including Cardinale] may tailor their testimony. *See Brown*, Case No. 15-21732-CV. These unique circumstances include the intricate structure of the investment funds and Cardinale's multiple roles in the companies.

Cardinale had a multitude of roles and conflicts and sources of income as, among other things, he acted as the (1) Fund Manager of the lending entity, L3 Capital Income Fund, (2) an owner and (3) Manager of the borrowing Alternative Numbered Entities, (4) a paid advisor through L3 Capital Advisors, (5) the sole manager of the entity being paid to provide back-office services named L3 Capital Management, (6) the recipient of renumeration of millions of dollars from the debt settlement business he did not enumerate to his investors, and (7) acquisition fees totaling hundreds of thousands of dollars for his alleged business expertise.

Not surprisingly, the court in the Initial Florida Federal Case has already quashed two and severely limited another of Cardinale's multiplicity of endless subpoenas seeking, among other things, confidential and proprietary business information from non-parties. *See* **Exhibit I** of Verified Petition the Order quashing subpoena to Davick Capital, LLC and **Exhibit J** the Orders

quashing and then severely limiting subpoenas to Titan Communications.  As set forth in the opposition declarations, those non-parties objected to handing over confidential and proprietary business records to Cardinale, an avowed competitor.  In Titan Communication's opposition to the subpoena, its owner recounted yet additional wrongful conduct by Cardinale. *See* **Exhibit K** of Verified Petition (without exhibits) ( at ¶ 2) (Sanders terminated relationship with Cardinale "after discovery of what I believed to be unethical and illegal behavior by Cardinale including his attempts at overbilling his own hedge fund clients and improperly failing to pay me in a timely manner.").

Cardinale also issued bogus subpoenas to Blackstream, LLC, Durham Homes, LLC and Broadstreet, Inc, all South Carolina businesses, seeking confidential and proprietary business information. Those entities moved to quash those subpoenas and the subpoena actions are pending in Federal District Court in South Carolina in matters styled as *Ex. Parte: Blackstream, LLC*, 6:22-cv-03390-TMC; *Ex Parte: Broadstreet Inc.*, 6:22-cv-03365-TMC and *Ex Parte: Durham Homes LLC*, 6:22-cv-03366-TMC.  As set forth in the opposition declarations there, these entities have grave concerns about giving over their business records to Cardinale, an avowed competitor, and properly objected to doing so. *See e.g.* **Exhibit L** of Verified Petition (at ¶ 2, and ¶¶ 8, 9, 16, 17, 30)("[N]one of the Alternative Global entities invested with Blackstream, LLC.  In short, Blackstream, LLC has had absolutely nothing to do with them in any manner except for the fact that the firm is owned by myself, a duly licensed attorney in the State of south Carolina, and Mr. Ford Elliott, and we have a professional relationship with Mr. David Feingold.").

**Cardinale Responds With Multiplicity of Unauthorized, Meritless Litigation**

In response to Feingold and Dazzo's Initial Florida Federal Case, Cardinale responded with a slew of phony cases for public relations purposes and to continue to defraud his L3 Capital

investors, often using the Alternative Numbered Entities as the purported plaintiff without Feingold's or Dazzo's approval or consent as required. Notably, approximately 70% of Cardinale's investors in his L3 Capital business have sought redemptions from him, thus indicating the entire business community besides his family and associates like Giardina have learned of Cardinale's associations and multiple business failures which were fraudulently hidden from the business community and they too have determined to remove themselves from Cardinale.

**Cardinale's Failed Delaware Action**.  *After* the filing of the Initial Florida Federal Case, Cardinale ran to Delaware Chancery Court to purportedly obtain the books and records that he was paid over $1.3 million to keep and maintain. Critically, Cardinale himself strenuously refused to produce any documents in that case. The Delaware Chancery Court in *Cardinale v. Feingold, et al.*, C.A. No. 2022-0133-LWW, recently dismissed Cardinale's efforts to obtain the books and records he was paid over $1.3 million to keep and maintain. *See* Vice Chancellor Lori W. Will's decision, dated January 10, 2023, annexed to the Verified Petition as **Exhibit M**.

As outrageous as it sounds, Cardinale sued claiming his books and records were stolen but refused to enumerate in that action (or ever) what books or records were stolen. Again, an example of Cardinale filing one of many illogical actions and all to distract from his horrific line of lies about his business successes and to try to hide his true business failures which he had defrauded his investors for so many years.  In short, Cardinale relied upon fake business performance for years in order to solicit investors. In reality, no matter what Cardinale now says, it is uncontroverted that AGM simply cannot operate with so much controversy and lack of corporate authorization and thereby it should be dissolved.

**Cardinale's New York State Case**: On or about October 17, 2022, Cardinale commenced a case in New York State Court styled *Alternative Global Six, LLC v. Durham Homes LLC,* Index

12

No. 653837/2022 (Sup. Ct., NY Cty). This pending case involves Cardinale's breach of his agreement to fund Durham Homes LLC, among his other misconduct, and failure to abide by an arbitration agreement to arbitrate disputes. Cardinale had no authority to commence this case for Alternative Global Six, LLC as it was done without the approval or consent of Feingold and Dazzo.

**Cardinale's Florida State Case I**: On or about November 17, 2022, Cardinale commenced a case in Florida State Court styled *Alternative* Global *Three, LLC v. DCG Staten Island, LLC, DCG Boca, LLC, DCG New Jersey, LLC, DCG New York, LLC, DCG Florida, LLC, DCG Texas, LLC,* Case No. 2022-022016-CA-01 (11th Judicial Circuit, Miami-Dade County Florida). This pending case is Cardinale essentially suing himself as he is one of the owners of the various "DCG" entities (standing for "Dazzo," "Cardinale," and "Giardina").  However, Cardinale in his investor "update" made it seem to his L3 Capital investors that suing himself actually accomplished something.  Cardinale had no authority to commence this case for Alternative Global Three, LLC as it was done without the approval or consent of Feingold and Dazzo.

**Cardinale's South Carolina Federal Case**: On or about December 14, 2022, Cardinale commenced a case in South Carolina Federal Court styled *Alternative* Global *Two, LLC, Alternative Global Four, LLC and Alternative Global Five, LLC v. Blackstream Development LLC*, Civil Action No. 6-22-cv-4501-TMC (D. South Carolina).  This pending case involves Cardinale's claim that Blackstream Development, LLC, a large South Carolina real estate developer, somehow owes the Alternative Number Entity plaintiffs there a fiduciary duty and an accounting even though Cardinale failed to present any written agreement and there is no basis for finding a fiduciary duty or for an accounting.  Blackstream Development, LLC made a pre-answer motion to dismiss Cardinale's Complaint (which is pending). Cardinale had no authority to commence

13

this case for Alternative Global Two, LLC,  Alternative Global Four, LLC and Alternative Global Five, LLC as it was done without the approval or consent of Feingold and Dazzo.

**Cardinale's Florida State Case II**: On or about January 17, 2023, Cardinale commenced a case in Florida State Court styled *Alternative Global One, LLC, Alternative Global Two, LLC, Alternative Global Three, LLC, Alternative Global Four, LLC, Alternative Global Five, LLC, Alternative Global Six, LLC v. David Feingold and Michael Dazzo,* Case No. 2023-000688-CA-01, Section CA43 (11th Judicial Circuit, Miami-Dade County Florida). This pending case involves Cardinale's purported and false claims against Feingold and Dazzo in connection with the Alternative Global Companies. This case was filed not long after Cardinale was deposed in the Initial Florida Federal Case wherein he disputed his own allegations in this case. Cardinale had no authority to commence this case for Alternative Global One, LLC, Alternative Global Two, LLC, Alternative Global Three, LLC, Alternative Global Four, LLC, Alternative Global Five, LLC, and Alternative Global Six, LLC as it was done without the approval or consent of Feingold and Dazzo.

**Cardinale's Florida JAMS Arbitration**: On or about February 17, 2023, Cardinale commenced a JAMS Arbitration styled *L3 Capital Management, LLC v. RIG Select Ventures, LLC*, claiming, among other things, he needs books and records that he apparently already had, has or should have access to.

**Cardinale Opposes Efforts to Assist His L3 Capital Investors**

Not surprisingly, in January 2023, Cardinale reported he "**has received redemption requests for more than $58 million, which is more than 70% of the total capital contributed**" by his L3 Capital investors.  *See* **Exhibit N** of Verified Petition (at 2), a recent letter, dated January 25, 2023, from Cardinale to his L3 Capital investors. Plainly, Cardinale's L3 Capital investors also want to get away from him as quickly as possible.  In that same letter, Cardinale also told his L3

Capital investors that L3 Capital's attorneys' fees will "be paid out of Income Fund assets" (at 1). Cardinale has also concealed from his investors his massive losses and misappropriations.

On January 17, 2023, Broadstreet New York Inc. commenced an interpleader action in New York State Court styled *Broadstreet New York Inc. v. L3 Capital Income Fund, LLC and Alternative Global Management, LLC*, Index No. 650218/2023 (Sup. Ct NY Cty), primarily to insure that the investors in Cardinale's L3 Capital receive appropriate distributions *without* Cardinale's interference or attempt at taking monies or continuing to use these dissatisfied investors' monies to pay his own attorneys' fees.  The Verified Interpleader Complaint is annexed to the Verified Petition as **Exhibit O**.

Cardinale has engaged in extreme gamesmanship in this interpleader case (and the others), thwarting the interpleader, and using L3 Capital, whose investors are seeking to cut ties with him, and Alternative Global Two, LLC,  Alternative Global Four, LLC and Alternative Global Five, LLC as "proposed intervenors" there, to further his own selfish goals and motivations. In a Decision and Order, dated March 15, 2023, the court there rejected Cardinale's shenanigans. *See* Decision and Order attached as **Exhibit P** of the Verified Petition.  Cardinale had no authority to seek to intervene in this case for Alternative Global Two, LLC, Alternative Global Four, LLC, and Alternative Global Five, LLC, as it was done without the approval or consent of Feingold and Dazzo.

In truth, Cardinale's unauthorized conduct and litigations is merely a continuation of Cardinale's specious efforts to try to destroy Feingold's business and relationships as he promised he would do when Feingold refused to accede to Cardinale's threats. *See* **Exhibit Q** of Verified Petition, declarations of Feingold (at ¶ 45) and Dazzo (at ¶¶ 4-6) submitted in the Initial Florida Federal Case.  Those filings were accepted by the court in the Initial Florida Federal Case who

then ordered Cardinale (and the other defendants) to sit for depositions before they obtained discovery due to concerns that Cardinale (and defendants) would fabricate testimony.

**There Exists Serious Concerns About Cardinale**

There are numerous issues of serious concern about Cardinale. Cardinale has lied about his background and past investment success (claiming an operational history of enormous investor returns yet unable to point to a single tax return or document to substantiate the fraudulent returns he claimed in order to induce his investors which are now redeeming), failed to detail his fees and earnings of in excess of $10.8 million made off his L3 Capital investors, has recently engaged in gangster-like activity against a potential witness and is an owner of another company that recently settled with the Federal Trade Commission for engaging in gangster-like conduct as well as a pending New York Attorney General action. Feingold has also recently uncovered additional evidence that Cardinale's claim that he never had any customer complaints against him is also untrue. There in fact are dozens of people with circumstances of negative issues with Cardinale.

Cardinale is also currently subject to pending litigation and substantial liability for his fraud and misappropriations. Cardinale has also improperly seized control over AGM, wrongfully frozen out Feingold and Dazzo, and engaged and continues to engage in other improper and unapproved activity with AGM's business, assets and funds.

**Cardinale Lies to His Investors and Feingold and Dazzo**

Cardinale is clearly in trouble. In Cardinale's private placement memorandum for L3 Capital, it sets forth Cardinale's substantial investment experience and acumen, including:

> Richard Cardinale, having built and/or invested in companies that are non-bank providers of alternative financial services - from "concept" through exit - has a deep understanding of the challenges such businesses face, as well as what is needed from the management team to ensure a business can evolve and grow through its evolutionary challenges.

16

Through his career, Mr. Cardinale has developed an extensive network of contacts in the start-up and growth-phase business communities across geographies and business segments, particularly with AFSPs.

Mr. Cardinale has served as a managing member of the Manager since its inception. The Manager has served as the manager of other private funds which invest in late state pre-IPO companies. Mr. Cardinale has approximately 20 years' experience in the financial services industry with broad experience in stocks, bonds, options, fixed income investments and private placements. Mr. Cardinale was a registered representative at PHX Financial, Inc., a registered broker-dealer from February 2013 through September 2019. From 2007 until 2013, Mr. Cardinale was also a registered representative at Empire Asset Management Company, as well as National Securities Corporation from 2002 until 2007, and Joseph Stevenson & Company Inc from 1994 to 2002. In each of these positions, Mr. Cardinale acted in a sales capacity where he maintained his own retail business with a clientele consisting of both retail and high net worth individuals. **Mr. Cardinale is also a managing member of various real estate investment companies.** The Manager attended St. John's University from 1990 to 1993.

See L3 PPM, at 26, annexed to the Verified Petition as **Exhibit R**.

The private placement memorandum for L3 Capital (at 5 and 21) also sets forth Cardinale's purported stellar track record of making outsized returns for his investors, as follows:

The Manager is targeting for the Fund to make an annual return of between twelve (12%) to fifteen (15%) percent with payments made to Investors quarterly [footnote omitted]. The Manager believes that such return is achievable due to the structure of the Investments intended to be made and **the returns that the principal of the Manager has experienced previously in the non-traditional finance industry.**

The principal of the Manager and his affiliates have invested their own capital in a number of different non-bank providers of alternative financial services for approximately the past ten years and have experienced returns on their investments that are consistent with the returns that the Fund is seeking to target for prospective investors in the Fund. The Fund seeks to achieve its investment objective by investing substantially all of its assets in Investments selected by the Manager based on the investment experience of the principal of the Manager in the alternative finance sector.

It turns out that Cardinale lied to investors in the private placement memorandum concerning his background and purported stellar track record of making outsized returns for his investors and in his recent deposition testimony in the Initial Florida Federal Case he could not

17

substantiate those private placement memorandum representations and suddenly claimed that he, a purported fund manager, is unable to understand basic business terms. Thus, Cardinale testified that he is unable to understand terms such as "compensation," "fund manager," "fund advisor," "advisory," "management fee," "acquisition fee," "distribution," "supervisor," "hedge fund," "internal rate of return," "net income," and "fixed cost," as he stated in his deposition that he could not speculate on the meaning of such basic business terms.

## EMERGENCY INTERIM RELIEF IS REQUIRED

In view of the irreconcilable differences between Feingold and Dazzo on the one hand and Cardinale on the other hand, and the other continuing improper conduct and pending lawsuits by Cardinale in relation to AGM, its business and its assets, AGM should be dissolved and its affairs wound up as quickly as possible. Emergency interim relief is required.

Cardinale has not only improperly usurped control over AGM and the Alternative Global Companies, but he is also engaging in unabated acts and conduct designed to irrevocably damage AGM, its business and its assets. He has even told multiple people that he would rather destroy everything and continue to litigate.

Cardinale has also taken control of and continues to decimate an AGM portfolio known as Alternative Spin. Thus, it was conveyed to Feingold that Cardinale unilaterally removed Feingold and Dazzo from Alternative Spin and other portfolios, and locked them out. Upon information and belief, Alternative Spin has seen its value cut in half, meaning multiple millions have somehow vanished since the time of Feingold and Dazzo's resignation from the Alternative Numbered Entities in January 2022. Cardinale has misappropriated some these funds and lost or misappropriated others, but either way he is running this AGM asset into the ground.

In addition, upon information and belief, the value of Alternative Global One, LLC's structured finance portfolio is now valued at about half of what it was when Feingold and Dazzo resigned meaning that about $25 million has vanished. Cardinale has either lost or misappropriated these funds, but either way he is running this AGM asset into the ground. Ultimately, this structured finance portfolio is needed to first pay back loans from Cardinale's L3 investors, but Cardinale has insufficient funds to pay back his redeeming investors as the current redemption demands are believed to exceed $58 million. Thus, Cardinale's continuing fraud and misconduct here threatens to further derail the business and any recovery for L3 Capital investors and AGM as well.

Furthermore, as alleged in the Second Amended Complaint, Cardinale has improperly charged AGM funds for his own personal use and it is believed that he is continuing to do so even while he has also stated that his L3 Capital investors are being required to finance what he unilaterally considers L3 litigation.  All the while, Cardinale seemingly continues to support a lavish lifestyle that includes a Staten Islan mansion, a New Jersey farm and a pricey beach home next to Giardina's beach home along with expensive cars, jewelry, restaurants and home furnishings.  Cardinale has even failed to file tax returns for AGM putting AGM at serious risk of penalties and IRS problems. *See* **Exhibit S** of Verified Petition.

Moreover, as described, Cardinale has launched and continues to prosecute multiple litigations by the Alternative Numbered Entities without the consent or approval of Feingold and Dazzo while it also remains unclear who is paying for all these litigations.  Regardless, as stated, these litigations are not authorized and left in Cardinale's stewardship are certain to cause further damage to AGM.  Feingold and Dazzo are also not on speaking terms with Cardinale, and Feingold and Dazzo detest Cardinale.

It is imperative that Cardinale be immediately restrained from taking any unilateral action by or on behalf of the Alternative Global Companies to avoid further and additional irreparable injury to the Alternative Global Companies by Cardinale.

**PETITIONERS ARE ENTITLED TO EMERGENCY INTERIM RELIEF**

R-38 of the AAA Commercial Arbitration Rules provides, in pertinent part, that the "arbitrator may take whatever interim measures he or she deems necessary," and that such "interim measures may take the form of an interim award." R-39 of the AAA Commercial Arbitration Rules provides the procedures by which a party in need of emergency relief prior to the constitution of the panel shall proceed, as here, including notifying the AAA and all other parties in writing of the nature of the relief sought, the reasons why such relief is required on an emergency basis, and the reasons why the party is entitled to such relief.  According to R-39, such notice may be given by email and include a statement certifying that all other parties have been notified or an explanation of the steps taken in good faith to notify other parties. Petitioners have satisfied the requirements of R-38 and R-39.

The nature of the relief being sought is emergency interim relief by an emergency arbitrator pending a decision by the appointed panel on a motion for a preliminary injunction.  In particular, Petitioners seek an emergency interim award against Cardinale restraining him from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies without the prior written approval and authorization from Petitioners.  Petitioners submit that they are entitled to the relief requested for the reasons set forth herein and in the Verified Petition. Petitioners have properly served the Verified Petition and this motion upon AGM and Cardinale.

"A temporary restraining order may be granted pending a hearing for a preliminary injunction where it appears that immediate and irreparable injury, loss or damage will result unless

20

the defendant is restrained before the hearing can be had." CPLR § 6301. A party seeking a preliminary injunction "must demonstrate a probability of success on the merits, danger of irreparable injury in the absence of an injunction and a balance of equities in its favor." *Nobu Next Door, LLC v. Fine Arts Hous., Inc.,* 4 N.Y.3d 839, 840 (2005); CPLR § 6301. These standards are amply met here.

The emergency arbitrator should issue an interim award restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies without the prior written approval and authorization from Petitioners pending the hearing and determination of Petitioners' application for a preliminary injunction by the appointed panel of arbitrators.  Emergency interim relief is required because:

* **Cardinale is destroying AGM's business.**

* **Cardinale has blocked Feingold and Dazzo from AGM and AGM's assets.**

* **Cardinale has misappropriated funds from the AGM bank account and has also blocked Feingold and Dazzo from accessing these accounts.**

* **Cardinale has also taken control of and continues to decimate an AGM portfolio known as Alternative Spin.**

* **Cardinale is believed to have siphoned off at least $300,000 from Alternative Spin for his own benefit.**

* **Cardinale has and continues to decimate Alternative Global One, LLC's structured finance portfolio misappropriating and/or losing approximately $25 million.**

* **Cardinale has launched and continues to prosecute multiple litigations by the Alternative Numbered Entities without the consent or approval of Feingold and Dazzo while it also remains unclear who is paying for all these litigations.**

* **Cardinale has not even filed tax returns for AGM.**

    \*      **Cardinale seemingly continues to support a lavish lifestyle (a Staten Island mansion, a New Jersey farm and a beach home next to Giardina along with expensive cars, jewelry, restaurants and home furnishings) while improperly charging AGM funds or assets for his own personal use and it is believed that he is continuing to do so even while he has also stated that his L3 Capital investors are being required to finance what he considers L3 litigation.**

    \*      **Feingold and Dazzo are also not on speaking terms with Cardinale, and Feingold and Dazzo detest Cardinale.**

Accordingly, immediate and irreparable injury, loss or damage will result unless Cardinale is restrained before the hearing and determination on a preliminary injunction. Simply put, Cardinale is destroying AGM and it appears to be intentional. It is imperative that Cardinale be immediately restrained from taking any unilateral action by or on behalf of the Alternative Global Companies, directly or indirectly, to avoid further and additional irreparable injury to the Alternative Global Companies by Cardinale.

Petitioners have well-satisfied the standard for obtaining a preliminary injunction. Petitioners have demonstrated a likelihood of success on the merits. Success on the merits does not mean certainty of success. The movant must demonstrate its right to the relief, though the evidence submitted need not be conclusive (although it is here). *Terrell v. Terrell*, 279 A.D.2d 301 (1st Dept. 2001); *McLaughlin, Piven, Vogel v. Nolan & Co.*, 114 A.D.2d 165, 172-173 (2nd Dept. 1986) ("[a]s to the likelihood of success on the merits, a prima facie showing of a right to relief is sufficient; actual proof of the case should be left to further court proceedings"), *lv. denied*, 67 N.Y.2d 606 (2nd Dept. 1986). Issues of fact are also insufficient to defeat the motion, CPLR § 6312(c) (providing that issues of fact identified in opposition to the application are insufficient to defeat the motion and "shall not in itself be grounds for denial of the motion."), and "a prima facie showing of a reasonable probability of success is sufficient." *Barbes Rest, Inc. v. ASRR Suzer 218,*

*LLC*, 140 A.D.3d 430, 431, 33 N.Y.S.3d 43 (1st Dept 2016)("A preliminary injunction would 'maintain the status quo [pending a hearing on the merits] and prevent the dissipation of property that could render a judgment ineffectual.'").  Where "[d]enial of injunctive relief would render the final judgment ineffectual, ... the degree of proof required to establish the element of success on the merits should be accordingly reduced" and the equities lie in favor of preserving the status quo. *Gramercy Co. v. Benenson*, 223 A.D.2d 497, 498, 637 N.Y.S.2d 383 (1st Dept 1996) [internal quotation marks omitted].

In the instant case, Petitioners have abundantly demonstrated their right to obtain a dissolution of AGM and its winding down. *Carlson v. Hallinan*, 925 A.2d 506, 543-544 (Del Ch 2006)("Further unique circumstances justify the dissolution of CR. Carlson, Hallinan and Gordon have demonstrated an inability to work together towards the common good of CR. Indeed, Hallinan testified that there were times when he and Carlson simply did not speak to each other. The Court's finding of liability and ordering of an accounting will only serve to exacerbate this untenable situation. Thus, this is no ordinary case of "mere dissension among the stockholders." Rather, this is a case of fundamental discord among the only three directors and shareholders of a corporation where two of them have repeatedly breached the fiduciary duties they owe the corporation and a minority stockholder."); *In re Dissolution of T&S Hardwoods KD, LLC*, 2023 Del. Ch. LEXIS 16, at *10 (Ch Jan. 20, 2023, Civil Action No. 2022-0782-MTZ)("Dissolution is appropriate in situations where the "LLC's management has become so dysfunctional . . . that it is no longer practicable to operate the business," such as the case of deadlock."); *Mehra v. Teller*, 2021 Del. Ch. LEXIS 16, 2021 WL 300352, at *19 (Del. Ch. Jan. 29, 2021) ("'[S]erious managerial issues,' such as strategic visions, major initiatives, and the operation and control of a company, will typically satisfy the qualitative requirements imposed by

23

statute and common law [for dissolution]." (*citing Vila v. BVWebTies LLC*, 2010 Del. Ch. LEXIS 202, 2010 WL 3866098, at *7 (Del. Ch. Oct. 1, 2010).

It is impossible to carry on the business of the LLC because, among other things: (i) Feingold and Dazzo are locked in litigation with Cardinale over the Alternative Global Companies and do not speak to Cardinale; (ii) Cardinale has improperly usurped control over AGM and has and is freezing out Feingold and Dazzo from AGM; (iii) Cardinale's improper usurpation of management and control over AGM, and other misconduct, violates the AROA; (iv) Cardinale has engaged in multiple acts of fraud, breach of duty and conversion in connection with AGM; (v) Cardinale has improperly usurped control over AGM's sole asset, the Alternative Numbered Entities, and is destroying AGM's business and the sole asset; (vi) Cardinale has and continues to misuse the assets of AGM for his sole benefit; (vii) Cardinale has commenced and is prosecuting multiple lawsuits purportedly in the name of the Alternative Numbered Entities without the required approval of Feingold and Dazzo and with the ultimate result of those entities which are pursuing claims having to pay Feingold and Dazzo.

Moreover, Cardinale has not only improperly usurped control over AGM and the Alternative Global Companies, but he is also engaging in acts and conduct designed to irrevocably damage AGM, its business and its assets and has even told multiple people that he would rather destroy everything and continue to litigate.  Thus, (i) Cardinale has failed to file tax returns for AGM putting AGM at serious risk of penalties and IRS problems, (ii) Cardinale has also taken control of and continues to decimate an AGM portfolio known as Alternative Spin, (iii) Cardinale has and continues to decimate the value of Alternative Global One, LLC's structured finance portfolio misappropriating and/or losing approximately $25 million, and (iv) Cardinale seemingly continues to support a lavish lifestyle while improperly charging AGM funds or assets for his own

personal use and it is believed that he is continuing to do so even while he has also stated that his L3 Capital investors are being required to finance what he considers L3 litigation.

Petitioners have also demonstrated irreparable harm.  Cardinale has and continues to take improper unilateral actions and misappropriations, is decimating AGM, its business and its assets and continues to pursue a multiplicity of unauthorized and unapproved proceedings.  Simply put, Cardinale is hell bent on destroying AGM making an interim TRO and preliminary injunction appropriate and absolutely required here. *Genger v. Genger*, 2010 NY Slip Op. 33929 (U), at * 15 (Sup. Ct., NY Cty June 28, 2010)("Under CPLR 7109, where the chattel is unique, the court may grant a preliminary injunction or temporary restraining order that it may not be transferred, sold, pledged, assigned or otherwise disposed of until the court orders (CPLR 7109 [a]) . . . Here, where the family shares at issue are intertwined among various family entities, defendants have not offered sufficient evidence to show that the shares of either TPR Investment or Trans-Resources owned by the Orly Genger 1993 Trust are not "unique" and should not be protected from transfer, sale, or assignment until this litigation is ultimately decided . . The balance of equities therefore lies in favor of plaintiff. Accordingly, the motion for a preliminary injunction is granted."); *Sau Thi Ma v. Xuan T. Lien*, 198 A.D.2d 186, 604 N.Y.S.2d 84 (1st Dept. 1993) (finding that if "the requested relief is not granted, a substantial amount of money may be dissipated or otherwise unavailable for recovery"); *U.S. Ice Cream Corp. v. Carvel Corp.*, 136 A.D.2d 626, 628, 523 N.Y.S.2d 869 (2d Dep't 1988) (interference with an ongoing business risks irreparable injury and is enjoinable"); *Societe Anonyme v. Pierre A. Feller*, 112 A.D.2d 837,492 N.Y.S.2d 756 (1st Dep't 1985)(In an action disputing the ownership of shares of a cooperative apartment, plaintiff was entitled to pendente lite injunctive relief since irreparable injury may arise if the defendant was not enjoined from transferring the cooperative's shares pending final resolution of the

dispute); *Ameriprise Ins. Co. v. Hampton*, 60 Misc 3d 1222(A), 2018 NY Slip Op 51207(U), *5 (Sup Ct, NY Cty 2018)("A plaintiff demonstrates irreparable harm and a balancing of the equities in its favor when injunctive relief would minimize repetitive litigation with the same claims, defense, and inconsistent judicial or arbitral decisions."); *Suttongate Holdings Ltd. v. Laconm Mgt. N.V.*, 2016 NY Slip Op 32341(U), *7 (Sup Ct, NY Cty 2016)("Moreover, Plaintiff has effectively demonstrated that money damages are insufficient, as the Corporations may cease to exist thereby making a judgment uncollectible."); *Rolnick v. Rolnick*, 230 N.Y.S.2d 789 (Sup. Ct, Queens Cty 1962)(In an action to impose a constructive trust upon the stock of defendant corporations, the court ruled that a disposition of the stock shares would render any judgment ineffectual, ruling that an injunction maintaining the status quo would not unduly burden the defendant, yet the denial of such relief could do irreparable harm and cause substantial prejudice to movant).

The third prong of the test for a preliminary injunction requires the balancing of the equities. This requires a showing that "the harm to plaintiff from denial of the injunction as against the harm to defendant from granting it" must "tip in plaintiff's favor" for an injunction to issue. *Edgeworth Food Corp. v. Stephenson*, 53 A.D.2d 588, 588, 385 N.Y.S.2d 64 (1st Dept 1976). The balance of the equities strongly favors Petitioners. Cardinale's hands are not unclean, they are filthy. Plainly, there is no injury to Cardinale imposed by restraining his wrongdoings, but there is continuing, irreparable damage to AGM if the requested relief is not provided. Accordingly, an interim award of a temporary restraining order and a preliminary injunction should be granted.

Moreover, with regard to closely held corporations or limited liability companies, as here, the purpose of a preliminary injunction is often to maintain the status quo pendente lite and to preserve assets and prevent dissipation of the property at issue. *Reichman v Reichman*, 88 A.D.3d 680, 930 N.Y.S.2d 262 (2d Dep't 2011). Thus, the emergency arbitrator and not yet appointed

26

arbitration panel, may, in its discretion, grant an injunction, effective during the pendency of the proceeding or such shorter period as it may specify. *Rust v Turgeon*, 295 A.D.2d 962, 746 N.Y.S.2d 223 (4th Dep't 2002).  In *Siebenberg v. Hoffman*, 2011 NY Slip Op 34252(U), *3 (Sup Ct, NY Cty 2011), the court there determined to maintain the status quo during the pendency of a dissolution application to prevent defendant from misappropriating the company's assets, as is required here.  Likewise, in *Scomello v. Pascarella*, 33 Misc 3d 1217(A), 1217A, 2011 NY Slip Op 51965(U), *3-4 (Sup Ct, Suffolk Cty 2011), the court granted a preliminary injunction in a dissolution action where the two members of a profitable LLC set forth diametrically opposed allegations of what has occurred in their business relationship ("The reason for the relief granted both parties rests in their hotly disputed allegations  regarding each member withdrawing funds over $100,000 without the other's involvement."). There, the court found that a preliminary injunction would inure to the benefit of both members to preserve the assets of the LLC.[4]

In sum, Petitioners have established the irrefutable need and appropriateness of the emergency interim relief requested.

## CONCLUSION

For the reasons stated, Petitioners respectfully request that the emergency arbitrator issue an interim award (pending a hearing and determination by the yet appointed arbitration panel on a preliminary injunction) restraining Richard Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of Alternative Global Management, LLC, Alternative Global One, LLC, Alternative Global Two, LLC, Alternative Global Three, LLC, Alternative Global Four, LLC, Alternative Global Five, LLC or Alternative Global Six, LLC without the prior written approval and authorization from Petitioners David Feingold and Michael Dazzo.

---

[4] No undertaking should be required of Petitioners here since Cardinale is in control of all of AGM's assets.

This shall certify that the AAA, Alternative Global Management, LLC and Richard Cardinale are being simultaneously notified about this application and being served a copy of this document and all attachments.

Dated:   May 22, 2023
         Mineola, New York

                          Respectfully submitted,

                          **WELTZ KAKOS GERBI WOLINETZ**
                          **VOLYNSKY LLP**

                     By:  /s/ *Irwin Weltz*
                          Irwin Weltz
                          Thomas Scot Wolinetz
                          170 Old Country Road, Suite 310
                          Mineola, New York 11501
                          Telephone: (516) 506-0561
                          Irwin@weltz.law
                          twolinetz@weltz.law

                          *Attorneys for Petitioners*
                          David Feingold and Michael Dazzo

# EXHIBIT 1

## VERIFIED PETITION

## SEE FILED VERIFIED PETITION
## FOR EXHIBITS

# AMERICAN ARBITRATION ASSOCIATION

--------------------------------------------------------------------X

In re:  **Dissolution of**                                  **AAA Case # _____**

**ALTERNATIVE GLOBAL MANAGEMENT, LLC,**
**a limited liability company.**

--------------------------------------------------------------------X

### VERIFIED PETITION FOR DISSOLUTION OF ALTERNATIVE
### GLOBAL MANAGEMENT, LLC, A LIMITED LIABILITY COMPANY

Petitioners David Feingold ("Feingold") and Michael Dazzo ("Dazzo") (collectively, "Petitioners"), hereby respectfully petition this Arbitration Panel to dissolve Alternative Global Management, LLC, a Delaware liability company ("AGM" or "LLC"), and for a declaration that, based on good cause shown, Petitioners may wind up the affairs of the LLC.  Further, Petitioners request an **emergency interim award**, preliminary injunction and permanent injunction against Respondent Richard Cardinale ("Cardinale") restraining him from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies (defined below) without the prior written approval and authorization from Petitioners.  The grounds for this Verified Petition are as follows:

### SUMMARY OF ACTION

1.      AGM was formed in September 2019 as a Delaware limited liability company. Feingold, Dazzo and Cardinale are the individual managers and control members of AGM.

2.      AGM is the ultimate manager and 100% owner of six entities – Alternative Global One, LLC, Alternative Global Two, LLC, Alternative Global Three, LLC, Alternative Global Four, LLC, Alternative Global Five, LLC and Alternative Global Six, LLC (collectively, as the "Alternative Numbered Entities" and with AGM the "Alternative Global Companies").  Feingold,

Dazzo and Cardinale each are also the one-third beneficial owners of the Alternative Numbered Entities as the Alternative Numbered Entities are owned by AGM.  As described below, RMD Holdings, LLC is listed as the manager of AGM and Dazzo as the Manager of RMD Holdings, LLC.

3.      Due to Cardinale's fraud and other misconduct and involvement in illegal activity, Feingold and Dazzo resigned from the Alternative Numbered Entities on January 28, 2022, but they did not resign from AGM.  Shortly thereafter, on February 5, 2022, Feingold and Dazzo sued Cardinale (and his co-conspirator spouse and alter-ego entities) in Florida federal court for fraud and other misconduct relating to the Alternative Global Companies.

4.      In response to that initial lawsuit, Cardinale began filing lawsuits on behalf of the Alternative Numbered Entities in courts in New York, South Carolina and Florida without the consent or approval of the manager or control members of AGM  - Feingold and Dazzo - as required by the Amended and Restated Operating Agreement for AGM (the "AROA") which requires unanimous consent of Feingold, Dazzo and Cardinale or the manager noted therein.  A copy of the AROA is annexed as **Exhibit A**.

5.      Those lawsuits were filed by Cardinale with full knowledge that he did not have corporate authorization and solely in retaliation for Feingold and Dazzo's lawsuit against Cardinale and Cardinale has made it clear that he would continue to file multiple lawsuits, without any authorization, against Feingold and Dazzo and others until they dropped their pursuit of him which involves millions of dollars of ill-gotten gains.

6.      Not only do those actions on behalf of AGM have no authorization to be filed as Feingold and Dazzo have never consented, but if any suit were prevailed upon, it would lead to the illogical result of AGM (or one of its wholly owned subsidiaries, the Alternative Numbered

Entities) suing and making a recovery that would ultimately be paid to Feingold and Dazzo (as Delaware law requires that payment to Feingold and Dazzo as the ultimate beneficial owners of all of the entities).  Hence, further proof that not only were the lawsuits filed without consent, but that they were filed consistent with Cardinale's threats of continuously filing lawsuits until Feingold and Dazzo would agree to ultimately drop their lawsuit in Florida federal court which will ultimately require Cardinale and his family to return millions of dollars that they have misappropriated.

7.      In addition, Cardinale, without authorization from Feingold and Dazzo, has misappropriated funds from the AGM bank account and has also blocked Feingold and Dazzo from accessing these accounts to discover the amount taken.  Further, Cardinale is believed to have siphoned off at least $300,000 which benefited him and without approval by Petitioners in particular in one asset of AGM known as Alternative Spin and, upon information and belief, he is taking assets from the Alternative Numbered Entities (and hence AGM) without proper authorization and approval.  Cardinale, even though he has seized control of AGM, has also not filed tax returns for AGM. Also, since Feingold and Dazzo resigned, upon information and belief and under the stewardship of Cardinale, the value of assets has dropped in half with Cardinale refusing to provide any records allowing Feingold and Dazzo to see what he is doing, where he is spending monies owed to Feingold and Dazzo and it has already been established that Cardinale has taken millions in violation of federal securities laws.

8.      It is no longer possible to carry on the business of the LLC because, among other things: (i) Feingold and Dazzo are locked in litigation with Cardinale over the Alternative Global Companies;  (ii) Cardinale has improperly usurped control over AGM and has and is freezing out Feingold and Dazzo from AGM; (iii) Cardinale's improper usurpation of management and control

3

over AGM, and other misconduct, violates the AROA; (iv) Cardinale has engaged in multiple acts of fraud, breach of duty and conversion in connection with AGM; (v) Cardinale has improperly usurped control over AGM's sole asset, the Alternative Numbered Entities, and is destroying the sole asset; (vi) Cardinale has and continues to misuse the assets of AGM for his sole benefit; (vii) Cardinale has commenced and is prosecuting multiple lawsuits purportedly in the name of the Alternative Numbered Entities without the required approval of Feingold and Dazzo and with the ultimate result of those entities which are pursuing claims having to pay Feingold and Dazzo, the ultimate owners of the same.

9.     Cardinale has not only improperly usurped control over AGM and the Alternative Global Companies, but he is also engaging in acts and conduct designed to irrevocably damage AGM, its business and its assets and has even told multiple people that he would rather destroy everything and continue to litigate.   Thus, (i) Cardinale has failed to file tax returns for AGM putting AGM at serious risk of penalties and IRS problems, (ii) Cardinale has also taken control of and continues to decimate an AGM portfolio known as Alternative Spin with millions in misappropriations and losses, (iii) Cardinale has and continues to decimate the value of Alternative Global One, LLC's structured finance portfolio misappropriating and/or losing approximately half its value or about $25 million which losses he has also concealed from his investors, and (iv) Cardinale seemingly continues to support a lavish lifestyle while improperly charging AGM funds or assets for his own personal use and it is believed that he is continuing to do so even while he has also stated that his L3 Capital investors are being required to finance what he unilaterally decides is L3 litigation.

10.     Petitioners seek dissolution of the LLC and request permission due to good cause shown to wind-up the affairs of the LLC.   Further, Petitioners seek a preliminary and permanent

injunction against Cardinale restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies without the prior written approval and authorization from Petitioners (which the AROA requires) and an emergency interim award immediately restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies.

## **JURISDICTION**

11.     There is jurisdiction over this matter and AGM, Feingold, Dazzo and Cardinale pursuant to the broad arbitration provision in the AROA. Thus, Section 10.07 of the AROA provides:

> (a) Dispute Resolution Process. In the event of **any claim, dispute, or controversy arising under, out of or relating to this Agreement**, or any breach or purported breach thereof (the "Dispute") which the Parties hereto have been unable to settle or agree upon in the normal course of business, the Parties shall follow the dispute resolution process as set forth herein.

> (b) Negotiations. The Parties shall attempt in good faith to resolve the Dispute promptly by negotiation between representatives who have authority to settle the Dispute and who are at a higher level of management than the persons with direct responsibility for administration of this Agreement. Either Party (in this context, the "Disputing Party") may give the other Party written notice of the existence of any such Dispute ("Dispute Notice"). Within fifteen (15) days after delivery of the Dispute Notice, the Party receiving the notice shall submit to the Disputing Party a written response. The Dispute Notice and the response shall each include: (i) a statement of the relevant Party's position and a summary of arguments supporting that position; and (ii) the name and title of the representative who will represent the Party in the negotiations and of any other person who will accompany such representative. Within thirty (30) days after delivery of the Dispute Notice, the representatives shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the Dispute ("Settlement Period"). However, this Settlement Period shall terminate no later than ninety (90) days after delivery of the Disputing Party's notice unless such period is extended by mutual written agreement of the Parties. All statements and/or negotiations pursuant to this Section are confidential and shall be treated as inadmissible compromise and settlement negotiations for purposes of all applicable state and/or federal rules of evidence.

(c) Arbitration. After, but only after, the Settlement Period set forth in Subsection (b) has terminated without a resolution, at the request of either Party to the Dispute, the Dispute shall be referred to and finally resolved by binding arbitration.

(i) **Any arbitration pursuant to this Section shall be administered by the American Arbitration Association (AAA)** using FINRA rules then in effect before a three member panel, with each Party selecting one arbitrator and the third arbitrator, who shall be the chairperson of the panel, being selected by the two Party-appointed arbitrators. The Party who initiates the arbitration process shall name its arbitrator in the demand for arbitration and the responding Party shall name its arbitrator within ten (10) days after receipt of the demand for arbitration. No arbitrator can be an employee, ex-employee, director, shareholder of record, Member, member, representative, or agent of such Party or its affiliates. The third arbitrator shall be named within ten (10) days after the appointment of the second arbitrator. If the two Party- appointed arbitrators are unable to agree upon the third arbitrator within that ten (10) day period, the third arbitrator shall be selected by the AAA. Each arbitrator shall be qualified by at least ten (10) years' experience in the corporate finance, private funds, and/or venture capital industry, and the chairperson of the arbitration panel shall be a licensed attorney whose primary area of practice for the preceding ten (10) years is in the corporate finance, private funds, and/or venture capital industry. If prior to the conclusion of the arbitration any arbitrator becomes incapacitated or otherwise unable to serve, then a replacement arbitrator shall be appointed in the applicable manner described above.

(ii) The arbitrators shall be bound by the terms and conditions of this Agreement, and any relevant evidence and testimony, and shall render their decision within thirty (30) calendar days following conclusion of the hearing. The award rendered by the arbitration panel shall be (i) in writing, signed by the arbitrators, stating the reasons upon which the award is based, (ii) rendered as soon as practicable after conclusion of the arbitration, and (iii) final and binding upon the Parties. Judgment on the award may be entered and enforced by any court of competent jurisdiction thereof. The Parties expressly invoke the provisions of the Federal Arbitration Act for purposes of confirmation, vacation or modification of the arbitration award (Title 9 U.S.C. §§ 9, 10 and 11). The preceding provisions of the Federal Arbitration Act are the sole and exclusive means by which an arbitration award can be reviewed, vacated or modified. The arbitrators shall, in any award, tax all of the arbitration fees (including arbitrators' fees) and costs of the arbitration (other than each Party's individual attorneys' fees and costs related to the Party's participation in the arbitration, which fees and costs shall be borne by such Party), against the losing Party. Until such award is made, however, the Parties shall share equally in paying the costs of the arbitration. Should

6

it become necessary for the prevailing Party to seek judicial enforcement of the arbitration award, all attorneys' fees and costs associated with that effort shall be taxed against the losing Party.

(iii) Only damages allowed pursuant to the terms of this Agreement may be awarded and, without limitation to the foregoing, the arbitrators shall have no jurisdiction to consider (i) any punitive, exemplary, special, indirect, incidental, consequential, or similar damages arising under, arising out of or related to this Agreement or damages beyond the limitations of liability contained in this Agreement, regardless of the legal theory under which such damages may be sought and even if the Parties have been advised of the possibility of such damages or loss, or (ii) any challenge to the validity of the limitation of liability provisions contained in this Agreement.

(d) Exclusivity. **The procedures specified in this Section shall be the sole and exclusive procedures for the resolution of Disputes between the Parties arising out of or in connection with this Agreement**.

(e) Tolling of Statute of Limitations. All applicable statutes of limitation and defenses based upon the passage of time shall be tolled during the Settlement Period while the procedures specified in this Section are pending. The Parties will take such action, if any, required to effectuate such tolling.

Emphasis added.

12.     Utilizing the pre-arbitration dispute resolution procedures would be futile since Feingold, Dazzo and Cardinale are currently locked and embroiled in multiple litigations and do not speak and have no interest in speaking, and they previously attempted to resolve disputes including by way of court ordered mediation without any success at all.  Also, Cardinale has disavowed the AROA.  Further, the pre-arbitration dispute resolution procedures are too vague and uncertain to be enforceable.

13.     Petitioners select New York County as the place for the live evidentiary hearings as Respondent Cardinale resides in the State of New York at 178 Benedict Road, Staten Island, New York and Cardinale has testified that he runs the Alternative Global Companies out of his Staten Island residence and a local UPS store.

## FACTUAL BACKGROUND

14.     We are dealing here with three individuals, Feingold, Dazzo and Cardinale. Beginning in 2019 and thereafter, they set up six entities, the Alternative Numbered Entities, through which they conducted various business, but the Alternative Numbered Entities took nothing, acted as a conduit and the monies flowed up to a seventh entity, AGM, which 100% owns and ultimately manages the Alternative Numbered Entities (as demonstrated in AGM's redated tax returns which show that AGM owns all of the Alternative Numbered Entities 100% with no other owners having any interest, **Exhibit B**).

**AGM, Alternative Numbered Entities and the AROA**

15.     AGM is the initial entity formed by Feingold, Dazzo and Cardinale in connection with the Alternative's business, and the initial AGM Operating Agreement, signed by  Feingold, Dazzo and Cardinale is annexed as **Exhibit C**.

16.     AGM was formed in order to manage the Alternative Numbered Entities and collect from them the proceeds of their business endeavors and then those proceeds would be first used to pay back amounts owed to Cardinale's L3 Capital Income Fund, LLC ("L3 Capital") investors with amounts above and beyond to be split equally between Feingold, Dazzo and Cardinale.  Thus, AGM is essential to the proper functioning of the entirety of the Alternatives' business.  Further, the Alternative Numbered Entities take nothing as part of this process as those entities are merely a conduit for distribution to AGM, as they are simply entities that reflect the source of various monies, *i.e.*, specialty finance, real estate, debt settlement, homebuilding, and restaurants in order to keep track of sources of divisions but thereafter all monies and management flow up to AGM. Simply put, the Alternative Numbered Entities do not exist without AGM, Feingold, Dazzo and Cardinale.

8

17.     In or about February 2021, Cardinale himself determined to engage in a restructuring of AGM to allow for certain of his investors to own Class B Units in AGM (non-voting), which resulted in the AROA. Cardinale sent dozens of emails to the Class B investors announcing the AROA and announcing the binding terms of the AROA to the entire AGM business.

18.     The AROA, along with a confirming letter that Cardinale sent to each of his investors advising them of the operation of the business under said document, provides that the management and control of the business and affairs of AGM is vested in the Manager. *See* definition of "Manager" at p. 3, § 6.01. **Exhibit A**.  This management and control of the business and affairs of AGM includes the business and affairs of AGM's only asset - - the Alternative Numbered Entities - - and the term "Affiliates" (which includes the Alternative Numbered Entities) is repeatedly used throughout the document (*See* definition of Permitted Transferee, 6.01(b), 6.01(c), 6.01(e), 6.10, 6.11(b), 6.12(a), 6.12(b), 6.12(c). 10.07(c)(i), 10.08, 10.16, 10.19, ).[1]

19.     The initial manager of AGM is listed as RMD Holdings, LLC [standing for **R**ichard (Cardinale), **M**ichael (Dazzo) and **D**avid (Feingold)](at page 3) and Dazzo as the Manager of RMD, but Cardinale has secreted certain RMD related materials (and others). Originally, in Federal Court in Florida, Cardinale claimed that his computers were stolen and he had no documents and hence refused to make the AROA and RMD documents available, but now he is selectively making documents available and has miraculously changed his story that all of his computers were stolen,

---

[1] "Affiliate" is defined at page 1 and means: "with respect to any specified Person or entity, any Person or entity that directly or indirectly controls, is controlled by, or is under common control with such specified Person or entity and, with respect to a specified Person that is an individual, such Person's Immediate Family Members. For purposes of this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise."

yet he only makes that claim when it is beneficial to him. Nonetheless, it is irrefutable that the AROA requires the unanimous consent of the managers (if multiple managers are appointed) or the unanimous consent of Feingold, Dazzo and Cardinale to take any action. *See* Cardinale letter ("Class A Units will be the only class of interests in the Company that will have voting rights"), and §§ 6.02, 6.05, 9.01. Cardinale, Feingold and Dazzo agreed to be bound by this subsequent LLC agreement for AGM  -  the AROA - and each of Feingold, Dazzo and Cardinale individually signed member consents for this action pursuant to the initial AGM Operating Agreement between and among them.

20.     It cannot be emphasized enough that Cardinale originally claimed in Federal Court in Florida that his computers were stolen and dubiously that the books and records involving AGM were missing. Cardinale now miraculously claims that he has certain documents, even though his alleged books and records were supposedly stolen, but miraculously, only the documents which in any way support Feingold and Dazzo have been claimed to be stolen and yet any document that might arguably help Cardinale, he is able to miraculously produce those documents even though all of his computers and records were miraculously stolen. This miraculous theft corresponds with a Federal District Judge taking the unusual step of having Cardinale and his wife appear for depositions before any other parties in the Initial Florida Federal Case (discussed below).

21.     While Cardinale will likely object in this case and change his story once again about how he now continues to find documents, what is completely uncontradicted by all parties is that this AGM relationship is broken beyond repair and that the operation of AGM simply cannot continue as the owners of the same simply cannot continue working together in any manner, especially in light of the fact that one owner, Cardinale, continues to file lawsuits without the

express consent of the other two owners, Feingold and Dazzo, and Cardinale has multiple businesses already in severe trouble as discussed below.

22.     Cardinale has unilaterally taken multiple improper actions, including freezing out Feingold and Dazzo, converting and destroying assets, and the filing of unauthorized lawsuits, without Feingold's and Dazzo's approval or consent. Significantly, in the multiplicity of litigations (described below), Cardinale has scrupulously avoided AGM because he is well aware that it is the 100% owner and ultimate manager of the Alternative Numbered Entities and that his improper unilateral acts and conduct, without Feingold's and Dazzo's approval, violate the AROA.

23.     Cardinale's purported amnesia about AGM is startling.  In fact, Cardinale's L3 entity *invoiced AGM* for over $1.3 million and was paid *by AGM* over $1.3 million for administrative services he claimed he had provided (but did not) for the Alternative Global Companies (*see* Exhibit D below, Second Amended Complaint, and Exhibit B thereto for those invoices) and Cardinale further received, among other things, a one-third profit split, amounting to approximately $3.3 million, *from AGM.*[2] This profit split occurred at the AGM level, the Alternative Numbered Entities *keep nothing*, and is for the amounts above and beyond those owing to the L3 Capital investors.  Cardinale has already testified and admitted in a court ordered

---

[2] Cardinale recently testified about this structure in the Initial Florida Federal Case that:

Were there monthly invoices that were sent to Alternative Global Management, LLC? A. Yes.

Q. **So you've received nothing personally or to an entity that you own or controlled from Alternative Global Management, LLC** MR. BENAYOUN: Object to the form of the question. A. **I'm saying I have**. Several times. BY MR. WELTZ:  Q. I thought you said you received those from L3.  I'm going to ask this a different way. How about this, what is the total compensation that you received directly or indirectly as an advisory fee, a management fee, an acquisition fee, and a total compensation? MR. BENAYOUN: Object to the form of the question. A. Okay. So I received over time a $1.6 million acquisition fee, L3 Capital Management received roughly 1.5 million, give or take in fees, administrative fees of which 700,000 was Titan Communications invoicing L3 Capital Management and the balance went to administrative costs. Any other disbursements that were made to David Feingold, Michael Dazzo and Richard Cardinale totaling about 8 -- 6.8 million, 6.9 million. **And those were disbursements which were above the 12 and 15 percent returns that -- with the targeted returns to the investors in the fund.** (emphasis supplied).

deposition of him that he was paid $1.6 million (that is the number he admits to), yet he claims ignorance and stolen books and records even though there are no police reports, insurance claims, no written complaints or evidence of those alleged thefts.  Only after Feingold and Dazzo sued Cardinale did Cardinale first claim his books and records were stolen (those same books and records that could be used against him to prove his multi-million dollar scam) and the same books and records which he accepted $1.6 million in fees as he always represented that he earned the fees by keeping all of the books and records.

24.     Cardinale now conveniently forgets about AGM and the process that was followed, and that he was paid L3 acquisition fees of $1,598,601.81; L3 advisory fees of $620,000; Alternative Global Management, LLC payments to DZ Squared (between December 1, 2020 and January 1, 2021) of which Cardinale received $2,987,000; Alternative Global Management, LLC management fee payments to RVCSI, LLC (an entity controlled by Cardinale) (between July 24, 2020 and April 8, 2022) of $3,263,055.05; debt settlement payments to Cardinale (between October 19, 2020 and January 28, 2022) of $1,935,000; $410,000 on closing fees paid to L3 Capital Management, LLC; and the in excess of $1.3 million (that Cardinale testified is $1.6 million) paid to Cardinale for claiming to maintain the books and records of the Alternative Global Companies. All of these payments to Cardinale are set forth above to show that someone that received nearly $11 million in total compensation and $1.6 million in specific payments for keeping the same books and records that he claims are now missing which would prove his fraud, should at a minimum show this Arbitration Panel that the suspicious nature of his handling of critical documents in combination with the obvious acrimonious nature of relationship amongst the owners shows that AGM cannot proceed, is irrevocably broken and should be dissolved quickly.

**Feingold and Dazzo Resign From the Alternative Numbered Entities**

25.     On January 28, 2022, Feingold and Dazzo resigned from the Alternative Numbered Entities, but not AGM, due to Cardinale's fraud and misconduct in connection with the Alternative Global Companies.  Feingold and Dazzo stayed in AGM knowing it is the ultimate owner and control party because its value is enormous, millions of dollars were made from the business and by resigning Feingold and Dazzo were immediately entitled to the payment of the fair value of their interests in the business as codified under Delaware law.  In short, Delaware law requires the payment of the fair value of the business to any LLC Members that resign and hence millions are owed to Feingold and Dazzo upon their resignation from the Alternative Numbered Entities. Thus, they removed themselves from involvement with Cardinale but did not remove themselves from the right to receive Delaware law mandated payments from him.

26.     Feingold and Dazzo could simply no longer maintain a relationship with Cardinale due to dozens of complaints of fraud and dishonesty by investors against Cardinale and their desire to disassociate from him and they also learned of his organized crime ties, including conduct such as being involved in sending thugs to a competitor's home residence to threaten and beat that person.  Feingold and Dazzo simply could not be involved with a person whose method of business involved such tactics.

**The Initial Florida Federal Case**

27.     On February 5, 2022, Feingold and Dazzo sued Cardinale and others in the pending action styled *David Feingold and Michael Dazzo v. Richard Cardinale, Vania Cardinale, RVCNY, LLC and RVCSI, LLC*, U.S.D.C. Southern District of Florida, Case No. 1:22-cv-20375-RKS/LMR (referred to herein as the "Initial Florida Federal Case"), wherein the plaintiffs there (Feingold and Dazzo) assert claims against Cardinale (and others) for various misconduct including claims for

13

breach of fiduciary duty, conversion and fraudulent misrepresentation in connection with the Alternative Global Companies. A copy of the operative complaint, the Second Amended Complaint, is annexed hereto as **Exhibit D**.

28.     The Second Amended Complaint in that Initial Florida Federal Case includes allegations and evidence that Cardinale, and his long-time business associate, Robert L. Giardina ("Giardina") (his partner of nearly 25 years as they conducted businesses together out of Staten Island), recently engaged in gangster-like tactics to try to force a competitor to give over his business to them.[3] (Exhibit D, at ¶¶ 55-62).

29.     Feingold and Dazzo also allege that Cardinale was paid over $1.3 million to maintain books and records that he did not maintain (Cardinale verbally admits it to be $1.6 million), paid additional fees for non-existent advisory services, converted bank account funds and assets and failed to properly disclose the in excess of $10.8 million that Cardinale took from the investors in L3 Capital, an investment fund solely managed by Cardinale. It should be noted that those L3 Capital investors now have taken their own actions against Cardinale and demanded of him in his separate business that they too want to disassociate from him and have basically sought

[3] Cardinale, Giardina, and another person have owned a merchant cash advance company that, with Giardina, is the subject of a recent Federal Trade Commission settlement (see FTC press release annexed hereto as **Exhibit E**) and continuing action brought by the New York Attorney General (NYAG Complaint annexed hereto as **Exhibit F**). Giardina has also invoked the Fifth Amendment in response to questions concerning his own and Cardinale's involvement with that business. *See* portions of Giardina's deposition and court decision annexed hereto as **Exhibit G**. Giardina was also recently found liable under a civil RICO statute in connection with that business in a case in the United States District Court for the Southern District of New York, where the court there recounted the FTC allegations that included "threatening physical violence when the merchants advise that they cannot make the payments required by the Agreements." ("After Richmond obtained a confessed judgment against the rabbi and synagogue, its harassment grew more intense with threats of a sexual and physical nature to the point where the Rabbi was forced to apply for an order of protection, which the Rabbi received.")("Richmond responded: "We will take everything from you. . . . We are from New York. . . . Don't mess with us."). *See Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, 2022 US Dist. LEXIS 100837, at *16-18 (SDNY June 6, 2022). The similarity between these recent improper tactics and the ones used by Cardinale/Giardina's merchant cash advance company cannot be overstated. It has now further come to light that Giardina has been a secret owner of Cardinale's RIA, L3 Capital Advisors, LLC.

to redeem the overwhelming majority of their own fund money from Cardinale. Feingold and Dazzo also seek additional substantial damages against Cardinale and his alter-ego entities for the fair value of their membership interests in the Alternative Numbered Entities as mandated by Delaware law.

30.    In the Initial Florida Federal Case, Feingold and Dazzo made a motion to require that Cardinale and the other defendants be deposed prior to their obtaining other discovery based upon concerns that Cardinale would fabricate testimony and the court granted that sequencing motion, finding (**Exhibit H** hereto, at 3-4):

> **Plaintiffs [Feingold and Dazzo] sufficiently allege the presence of unique circumstances that generate a concern that Defendants [including Cardinale] may tailor their testimony. *See Brown*, Case No. 15-21732-CV. These unique circumstances include the intricate structure of the investment funds and Cardinale's multiple roles in the companies.**

31.    As the Initial Florida Federal Case shows, there are a litany of problems which Cardinale has created for himself including that Cardinale had a multitude of roles and conflicts and sources of income as, among other things, he acted as the (1) Fund Manager of the lending entity, L3 Capital Income Fund, (2) an owner and (3) Manager of the borrowing Alternative Numbered Entities, (4) a paid advisor through L3 Capital Advisors, (5) the sole manager of the entity being paid to provide back-office services named L3 Capital Management, (6) the recipient of renumeration of millions of dollars from the debt settlement business he did not enumerate to his investors, and (7) acquisition fees totaling hundreds of thousands of dollars for his alleged business expertise. Cardinale wore many hats in many businesses, much of which was not properly disclosed to his investors while he took millions for himself.

32.    Not surprisingly, the court in the Initial Florida Federal Case has already quashed two and severely limited another of Cardinale's multiplicity of endless subpoenas seeking, among

other things, confidential and proprietary business information from non-parties. *See* **Exhibit I** the Order quashing subpoena to Davick Capital, LLC and **Exhibit J** the Orders quashing and then severely limiting subpoenas to Titan Communications.  As set forth in the opposition declarations, those non-parties objected to handing over confidential and proprietary business records to Cardinale, an avowed competitor. In Titan Communication's opposition to the subpoena, its owner recounted yet additional wrongful conduct by Cardinale. *See* **Exhibit K** hereto (without exhibits) ( at ¶ 2) (Sanders terminated relationship with Cardinale "after discovery of what I believed to be unethical and illegal behavior by Cardinale including his attempts at overbilling his own hedge fund clients and improperly failing to pay me in a timely manner.").

33.     Cardinale also issued bogus subpoenas to Blackstream, LLC, Durham Homes, LLC and Broadstreet, Inc, all South Carolina businesses, seeking confidential and proprietary business information. Those entities moved to quash those subpoenas and the subpoena actions are pending in Federal District Court in South Carolina in matters styled as *Ex. Parte: Blackstream, LLC*, 6:22-cv-03390-TMC; *Ex Parte: Broadstreet Inc.*, 6:22-cv-03365-TMC and *Ex Parte: Durham Homes LLC*, 6:22-cv-03366-TMC.  As set forth in the opposition declarations there, these entities have grave concerns about giving over their business records to Cardinale, an avowed competitor, and properly objected to doing so. *See e.g.* **Exhibit L** hereto (at ¶ 2, and ¶¶ 8, 9, 16, 17, 30)("[N]one of the Alternative Global entities invested with Blackstream, LLC.  In short, Blackstream, LLC has had absolutely nothing to do with them in any manner except for the fact that the firm is owned by myself, a duly licensed attorney in the State of south Carolina, and Mr. Ford Elliott, and we have a professional relationship with Mr. David Feingold.").

**Cardinale Responds With Multiplicity of Unauthorized, Meritless Litigation**

34.     In response to Feingold and Dazzo's Initial Florida Federal Case, which has exposed to the world the extent of Cardinale's wrongful business practices and legal violations, Cardinale responded with a slew of phony cases for public relations purposes and to continue to defraud his L3 Capital investors, often using the Alternative Numbered Entities as the purported plaintiff without Feingold's or Dazzo's approval or consent as required. Notably, approximately 70% of Cardinale's investors in his L3 Capital business have sought redemptions from him, thus indicating the entire business community besides his family and associates like Giardina have learned of Cardinale's associations and multiple business failures which were fraudulently hidden from the business community and they too have determined to remove themselves from Cardinale.

35.     **Cardinale's Failed Delaware Action**.  *After* the filing of the Initial Florida Federal Case, Cardinale ran to Delaware Chancery Court to purportedly obtain the books and records that he was paid over $1.3 million to keep and maintain. Critically, Cardinale himself strenuously refused to produce any documents in that case. The Delaware Chancery Court in *Cardinale v. Feingold, et al.*, C.A. No. 2022-0133-LWW, recently dismissed Cardinale's efforts to obtain the books and records he was paid over $1.3 million to keep and maintain. *See* Vice Chancellor Lori W. Will's decision, dated January 10, 2023, annexed hereto as **Exhibit M**. As outrageous as it sounds, Cardinale sued claiming his books and records were stolen but refused to enumerate in that action (or ever) what books or records were stolen. Yet again, an example of Cardinale filing one of many illogical actions and all to distract from his horrific line of lies about his business successes and to try to hide his true business failures which he had defrauded his investors for so many years.  In short, Cardinale relied upon fake business performance for years in order to solicit investors.  In reality, no matter what Cardinale now says, it is uncontroverted that AGM simply

cannot operate with so much controversy and lack of corporate authorization and thereby it should be dissolved.

36. **Cardinale's New York State Case**: On or about October 17, 2022, Cardinale commenced a case in New York State Court styled *Alternative Global Six, LLC v. Durham Homes LLC,* Index No. 653837/2022 (Sup. Ct., NY Cty). This pending case involves Cardinale's breach of his agreement to fund Durham Homes LLC, among his other misconduct, and failure to abide by an arbitration agreement to arbitrate disputes. Cardinale had no authority to commence this case for Alternative Global Six, LLC as it was done without the approval or consent of Feingold and Dazzo.

37. **Cardinale's Florida State Case I**: On or about November 17, 2022, Cardinale commenced a case in Florida State Court styled *Alternative* Global *Three, LLC v. DCG Staten Island, LLC, DCG Boca, LLC, DCG New Jersey, LLC, DCG New York, LLC, DCG Florida, LLC, DCG Texas, LLC,* Case No. 2022-022016-CA-01 (11th Judicial Circuit, Miami-Dade County Florida). This pending case is Cardinale essentially suing himself as he is one of the owners of the various "DCG" entities (standing for "Dazzo," "Cardinale," and "Giardina"). However, Cardinale in his investor "update" made it seem to his L3 Capital investors that suing himself actually accomplished something. Cardinale had no authority to commence this case for Alternative Global Three, LLC as it was done without the approval or consent of Feingold and Dazzo.

38. **Cardinale's South Carolina Federal Case**: On or about December 14, 2022, Cardinale commenced a case in South Carolina Federal Court styled *Alternative* Global *Two, LLC, Alternative Global Four, LLC and Alternative Global Five, LLC v. Blackstream Development LLC*, Civil Action No. 6-22-cv-4501-TMC (D. South Carolina). This pending case involves Cardinale's claim that Blackstream Development, LLC, a large South Carolina real estate developer, somehow

owes the Alternative Number Entity plaintiffs there a fiduciary duty and an accounting even though Cardinale failed to present any written agreement and there is no basis for finding a fiduciary duty or for an accounting.  Blackstream Development, LLC made a pre-answer motion to dismiss Cardinale's Complaint (which is pending). Cardinale had no authority to commence this case for Alternative Global Two, LLC,  Alternative Global Four, LLC and Alternative Global Five, LLC as it was done without the approval or consent of Feingold and Dazzo.

39.     **Cardinale's Florida State Case II**: On or about January 17, 2023, Cardinale commenced a case in Florida State Court styled *Alternative Global One, LLC, Alternative Global Two, LLC, Alternative Global Three, LLC, Alternative Global Four, LLC, Alternative Global Five, LLC, Alternative Global Six, LLC v. David Feingold and Michael Dazzo,* Case No. 2023-000688-CA-01, Section CA43 (11th Judicial Circuit, Miami-Dade County Florida). This pending case involves Cardinale's purported and false claims against Feingold and Dazzo in connection with the Alternative Global Companies. This case was filed not long after Cardinale was deposed in the Initial Florida Federal Case wherein he disputed his own allegations in this case. Cardinale had no authority to commence this case for Alternative Global One, LLC, Alternative Global Two, LLC, Alternative Global Three, LLC, Alternative Global Four, LLC, Alternative Global Five, LLC, and Alternative Global Six, LLC as it was done without the approval or consent of Feingold and Dazzo.

40.     **Cardinale's Florida JAMS Arbitration**: On or about February 17, 2023, Cardinale commenced a JAMS Arbitration styled *L3 Capital Management, LLC v. RIG Select Ventures, LLC,* claiming, among other things, he needs books and records that he apparently already had, has or should have access to.

**Cardinale Opposes Efforts to Assist His L3 Capital Investors**

41.     Not surprisingly, in January 2023, Cardinale reported he "**has received redemption requests for more than $58 million, which is more than 70% of the total capital contributed**" by his L3 Capital investors.  *See* **Exhibit N** hereto (at 2), a recent letter, dated January 25, 2023, from Cardinale to his L3 Capital investors. Plainly, Cardinale's L3 Capital investors also want to get away from him as quickly as possible.  In that same letter, Cardinale also told his L3 Capital investors that L3 Capital's attorneys' fees will "be paid out of Income Fund assets" (at 1).

42.     On January 17, 2023, Broadstreet New York Inc. commenced an interpleader action in New York State Court styled *Broadstreet New York Inc. v. L3 Capital Income Fund, LLC and Alternative Global Management, LLC*, Index No. 650218/2023 (Sup. Ct NY Cty), primarily to insure that the investors in Cardinale's L3 Capital receive appropriate distributions *without* Cardinale's interference or attempt at taking monies or continuing to use these dissatisfied investors' monies to pay his own attorneys' fees.  The Verified Interpleader Complaint is annexed hereto as **Exhibit O**.

43.     Cardinale has engaged in extreme gamesmanship in this interpleader case (and the others), thwarting the interpleader, and using L3 Capital, whose investors are seeking to cut ties with him, and Alternative Global Two, LLC,  Alternative Global Four, LLC and Alternative Global Five, LLC as "proposed intervenors" there, to further his own selfish goals and motivations. In a Decision and Order, dated March 15, 2023, the court there rejected Cardinale's shenanigans. *See* Decision and Order attached as **Exhibit P**.  Cardinale had no authority to seek to intervene in this case for Alternative Global Two, LLC, Alternative Global Four, LLC, and Alternative Global Five, LLC, as it was done without the approval or consent of Feingold and Dazzo.

44.     In truth, Cardinale's unauthorized conduct and litigations is merely a continuation of Cardinale's specious efforts to try to destroy Feingold's business and relationships as he promised he would do when Feingold refused to accede to Cardinale's threats. *See* **Exhibit Q** hereto, declarations of Feingold (at ¶ 45) and Dazzo (at ¶¶ 4-6) submitted in the Initial Florida Federal Case.  Those filings were accepted by the court in the Initial Florida Federal Case who then ordered Cardinale (and the other defendants) to sit for depositions before they obtained discovery due to concerns that Cardinale (and defendants) would tailor his testimony.

**There Exists Serious Concerns About Cardinale**

45.     There are numerous issues of serious concern about Cardinale.  Cardinale has lied about his background and past investment success (claiming an operational history of enormous investor returns yet unable to point to a single tax return or document to substantiate the fraudulent returns he claimed in order to induce his investors which are now redeeming), failed to detail his fees and earnings of in excess of $10.8 million made off his L3 Capital investors, has recently engaged in gangster-like activity against a potential witness and is an owner of another company that recently settled with the Federal Trade Commission for engaging in gangster-like conduct as well as a pending New York Attorney General action. Feingold has also recently uncovered additional evidence that Cardinale's claim that he never had any customer complaints against him is also untrue. There, in fact, are dozens of people with circumstances of negative issues with Cardinale.

46.     Cardinale is also currently subject to pending litigation and substantial liability for his fraud and misappropriations.

47.     Cardinale has also improperly seized control over AGM, wrongfully frozen out Feingold and Dazzo, and engaged and continues to engage in other improper and unapproved activity with AGM's assets and funds.

**Cardinale Lies to His Investors and Feingold and Dazzo**

48.     Cardinale is clearly in trouble.  In Cardinale's private placement memorandum for L3 Capital, it sets forth Cardinale's substantial investment experience and acumen, including:

> Richard Cardinale, having built and/or invested in companies that are non-bank providers of alternative financial services - from "concept" through exit - has a deep understanding of the challenges such businesses face, as well as what is needed from the management team to ensure a business can evolve and grow through its evolutionary challenges.

> Through his career, Mr. Cardinale has developed an extensive network of contacts in the start-up and growth-phase business communities across geographies and business segments, particularly with AFSPs.

> Mr. Cardinale has served as a managing member of the Manager since its inception.  The Manager has served as  the manager of other private funds which invest in late state pre-IPO companies. Mr. Cardinale has approximately 20 years' experience in the financial services industry with broad experience in stocks, bonds, options, fixed income investments and private placements.  Mr. Cardinale was a registered representative at PHX Financial, Inc., a registered broker-dealer from February 2013 through September 2019.  From 2007 until 2013, Mr. Cardinale was also a registered representative at Empire Asset Management Company, as well as National Securities Corporation from 2002 until 2007, and Joseph Stevenson & Company Inc from 1994 to 2002. In each of these positions, Mr. Cardinale acted in a sales capacity where he maintained his own retail business with a clientele consisting of both retail and high net worth individuals. **Mr. Cardinale is also a managing member of various real estate investment companies.**  The Manager attended St. John's University from 1990 to 1993.

See L3 PPM, at 26, annexed hereto as **Exhibit R**.

49.     The private placement memorandum for L3 Capital (at 5 and 21) also sets forth Cardinale's purported stellar track record of making outsized returns for his investors, as follows:

> The Manager is targeting for the Fund to make an annual return of between twelve (12%) to fifteen (15%) percent with payments made to Investors

quarterly [footnote omitted]. The Manager believes that such return is achievable due to the structure of the Investments intended to be made and **the returns that the principal of the Manager has experienced previously in the non-traditional finance industry.**

The principal of the Manager and his affiliates have invested their own capital in a number of different non-bank providers of alternative financial services for approximately the past ten years and have experienced returns on their investments that are consistent with the returns that the Fund is seeking to target for prospective investors in the Fund.  The Fund seeks to achieve its investment objective by investing substantially all of its assets in Investments selected by the Manager based on the investment experience of the principal of the Manager in the alternative finance sector.

50.     It turns out that Cardinale lied to investors in the private placement memorandum concerning his background and purported stellar track record of making outsized returns for his investors and in his recent deposition testimony in the Initial Florida Federal Case he could not substantiate those private placement memorandum representations and suddenly claimed that he, a purported fund manager, is unable to understand basic business terms. Thus, Cardinale, an investment fund manager with due diligence obligations, testified that he is unable to understand terms such as "compensation," "fund manager," "fund advisor," "advisory," "management fee," "acquisition fee," "distribution," "supervisor," "hedge fund," "internal rate of return," "net income," and "fixed cost," as he stated in his deposition that he could not speculate on the meaning of such basic business terms.

## EMERGENCY RELIEF IS REQUIRED

51.     In view of the irreconcilable differences between Petitioners Feingold and Dazzo on the one hand and Cardinale on the other hand, and the other continuing improper conduct and pending lawsuits by Cardinale in relation to AGM and its assets, AGM should be dissolved and its affairs wound up as quickly as possible.  Emergency relief is required.

52.     Cardinale has not only improperly usurped control over AGM and the Alternative Global Companies, but he is also engaging in acts and conduct designed to irrevocably damage

AGM and its assets.  He has even told multiple people that he would rather destroy everything and continue to litigate.

53.     Cardinale has even failed to file tax returns for AGM putting AGM at serious risk of penalties and IRS problems. *See* **Exhibit S**.

54.     Cardinale has also taken control of and continues to decimate an AGM portfolio known as Alternative Spin.  Thus, it was conveyed to Feingold that Cardinale unilaterally removed Feingold and Dazzo from Alternative Spin and other portfolios, and locked them out. Upon information and belief, Alternative Spin is worth less than half of its value since the time of Feingold and Dazzo's resignation from the Alternative Numbered Entities in January 2022, meaning multiple millions of dollars have vanished - - Cardinale has misappropriated some these funds and lost or misappropriated others, but either way he is running this AGM asset into the ground.

55.     In addition, upon information and belief, the value of Alternative Global One, LLC's structured finance portfolio has been cut in half since Feingold and Dazzo resigned meaning that about $25 million has disappeared.  Cardinale has either lost or misappropriated these funds, but either way  he is running this AGM asset into the ground.  Ultimately, this structured finance portfolio is needed to first pay back loans from Cardinale's L3 investors, but Cardinale has insufficient funds to pay back his redeeming investors as the current redemption demands are believed to exceed $58 million. Thus, Cardinale's continuing fraud and misconduct here threatens any recovery for AGM as well.  Not surprisingly, Cardinale has also hidden these massive losses from his L3 Capital investors.

56.     Furthermore, as alleged in the Second Amended Complaint, Cardinale has improperly charged AGM funds for his own personal use and it is believed that he is continuing

to do so even while he has also stated that his L3 Capital investors are being required to finance what he considers L3 litigation.  All the while, Cardinale seemingly continues to support a lavish lifestyle that includes a Staten Island mansion, a New Jersey farm and a pricey beach home next to Giardina's beach home along with expensive cars, jewelry, restaurants and home furnishings.

57.     Moreover, as described, Cardinale has launched and continues to prosecute multiple litigations by the Alternative Numbered Entities without the consent or approval of Feingold and Dazzo while it also remains unclear who is paying for all these litigations. Regardless, as stated, these litigations are not authorized and left in Cardinale's stewardship are certain to cause further damage to AGM.

58.     Feingold and Dazzo are also not on speaking terms with Cardinale, and Feingold and Dazzo detest Cardinale.

59.     It is imperative that Cardinale be immediately restrained from taking any unilateral action by or on behalf of the Alternative Global Companies to avoid further and additional irreparable injury to the Alternative Global Companies by Cardinale.

<u>**COUNT I**</u>
<u>**DISSOLUTION OF THE LLC**</u>

60.     The individual managers and control members of the LLC are unable to agree on carrying on the LLC's business pursuant to the terms of the AROA or otherwise and are not on speaking terms.

61.     Cardinale has and continues to engage in acts and conduct designed to destroy the business of AGM and its sole asset, the Alternative Numbered Entities.

62.     Cardinale's fraudulent and improper conduct in, among other things (i) improperly usurping control over AGM and freezing out Feingold and Dazzo from AGM; (ii) improperly usurping management and control over AGM, and other misconduct, violating the AROA and

applicable law; (iii) engaging in multiple acts of fraud and conversion in connection with AGM; (iv) improperly usurping control over AGM's sole asset, the Alternative Numbered Entities, and destroying the sole asset; and (v) commencing and currently prosecuting multiple lawsuits purportedly in the name of the Alternative Numbered Entities without the required approval of Feingold and Dazzo, establishes that it is impossible to carry on the business of the LLC.

63.     Accordingly, the LLC should be dissolved.

**COUNT II**
**PETITION TO WIND UP AFFAIRS**

64.     The foregoing facts satisfy any requirement to permit Petitioners to wind up the affairs of the LLC.

65.     Accordingly, the LLC should be wound up by Petitioners or other suitable person that is not Cardinale.

**COUNT III**
**EMERGENCY INTERIM RELIEF AND PRELIMINARY/PERMANENT INJUNCTION**

66.     Petitioners seek a preliminary and permanent injunction against Cardinale restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies without the prior written approval and authorization from Petitioners and an emergency interim award immediately restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies without the prior written approval and authorization from Petitioners.

67.     The foregoing facts demonstrate that Petitioners will likely succeed on the merits, there will be irreparable injury if the provisional relief is not granted, and the balance of the equities favor Petitioners.

\*   \*   \*

26

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioners respectfully request that this Arbitration Panel issue and Award:

**A.** dissolving the LLC;

**B.** declaring that Petitioners may wind up the LLC's affairs;

**C.** issuing a preliminary and permanent injunction against Cardinale restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies without the prior written approval and authorization from Petitioners;

**D.** issuing an emergency interim award immediately restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies without the prior written approval and authorization from Petitioners;

**E.** requiring reimbursement of Petitioners' attorneys' fees and other expenses incurred by Petitioners regarding the dissolution, including this Arbitration; and,

**F.** awarding such other relief in Petitioners' favor as may be just and appropriate.

Dated:   May 21, 2023
        Mineola, New York

Respectfully submitted,

**WELTZ KAKOS GERBI WOLINETZ
VOLYNSKY LLP**

By:  /s/ *Irwin Weltz*
    Irwin Weltz
    Thomas Scot Wolinetz
    170 Old Country Road, Suite 310
    Mineola, New York 11501
    Telephone: (516) 506-0561
    Irwin@weltz.law
    twolinetz@weltz.law

    *Attorneys for Petitioners*
    David Feingold and Michael Dazzo

27

## VERIFICATION

STATE OF FLORIDA     )
                          )     ss:
COUNTY OF MIAMI-DADE)

David Feingold, being duly sworn, deposes and says:

I am one of the Petitioners in this matter.  I have read the foregoing Verified Petition and know its contents. The Verified Petition is true to my knowledge, except as to matters alleged on information and belief, and as to those matters, I believe them to be true.

_____

David Feingold

State of Florida     County of _Broward_
The foregoing instrument was acknowledged before me
via ☐ physical presence  OR  ☑ online notarizations
this _22_ day of _May_ , 20 _23_ .
By _David Feingold_
Personally known _✓_ OR produced identification _____
Type of identification produced _____
_Marisela Cusati_
NOTARY NAME HERE, Notary Public
My Commission Expires _01/12/2024_

MARISELA CUSATI
Notary Public-State of Florida
Commission # GG 925765
My Commission Expires
January 12, 2024

28